796 So.2d 491 (2001)
Newton Carlton SLAWSON, Appellant,
v.
STATE of Florida, Appellee.
No. SC90045.
Supreme Court of Florida.
July 5, 2001.
Rehearing Denied September 24, 2001.
*492 Chris DeBock, Assistant CCRC-Middle, and Mark S. Gruber, Assistant CCRC-Middle, Capital Collateral Regional Counsel-Middle Region, Tampa, FL, for Appellant.
Newton C. Slawson, Raiford, Appellant, pro se.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have for review an order from the Circuit Court of the Thirteenth Judicial Circuit which finds that Newton Carlton Slawson, a person under four sentences of death, is competent to waive his rights to collateral counsel and collateral proceedings. The circuit court also determined that Slawson's waiver was knowing, intelligent, and voluntary. By order dated November 7, 2000, we requested the office of the Capital Collateral Regional Counsel-Middle Region (CCRC-M), the State of Florida (the State), and Slawson to submit briefs to this Court directed to the issue of the circuit court's competency determination and the validity of Slawson's waiver of collateral counsel and collateral proceedings. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the order of the circuit court.

I. FACTS AND PROCEDURAL HISTORY
A jury found Slawson guilty on four counts of first-degree premeditated murder and one count of manslaughter with a firearm for killing an unborn child by injuring the mother. The facts from the direct appeal of the case show that on April 11, 1989, Peggy Wood, her husband Gerald, and their two children, Jennifer (age four) and Glendon (age three) were murdered in their home. Also lost was the fetus Peggy Wood was carrying, which was eight and one-half months old. Peggy *493 Wood lived with her family in a garage apartment that was adjacent to her parents' home in Hillsborough County. At approximately 10 p.m. on April 11, Peggy Wood was found lying on the back porch of her parents' home, having been shot once in the abdomen and once in the back, while also having been cut with a knife from the base of the sternum to the pelvic area. She also had several cuts on her right thigh. Shortly before dying, Peggy Wood told her mother that Slawson had "killed [her husband] Gerry and the kids." Slawson v. State, 619 So.2d 255 (Fla.1993). Gerald Wood and the two children died as a result of gunshot wounds. Gerald had also been stabbed in the back. The Woods' unborn baby was found lying near Gerald's body, having sustained two gunshot wounds and multiple lacerations that resulted from the appellant's attack on Peggy. Slawson claimed that he cut the unborn fetus out of Peggy's body, in an attempt to save it, after determining that both Gerald and Peggy were dead. See id. at 257.
The facts from the direct appeal also described the events preceding the murders:
After his arrest [on the night of the killings], Slawson told detectives that he went to the Woods' residence on the day of the murders. He took a six inch knife and a .357 revolver. At Gerald's request, Slawson put the gun in the bathroom so the children would not get it. He gave the knife to Gerald Wood to use to cut rock cocaine. Gerald Wood offered to sell Slawson some of the cocaine but Slawson refused the offer. When Peggy said Slawson might be the police, Slawson went to the bathroom to get his gun so he could leave. When Slawson returned, Gerald Wood got up with the knife in his hand. According to his statement, Slawson shot Gerald and may have shot Peggy at that time. As Slawson proceeded to the children's bedroom and shot them, Peggy Wood was screaming. After shooting the children he returned to the living room and shot Peggy again. Slawson then inserted his knife into Peggy Wood's abdomen and cut upward, causing the fetus to be expelled.
Slawson, 619 So.2d at 257. Slawson also testified at trial that he believed Gerald had placed drugs in his beer, which caused him to feel odd and to believe he was locked in the apartment. See id.
Slawson was found guilty of four counts of first-degree murder and one count of killing an unborn child by injury to the mother. He received death sentences for each of the first-degree murders, along with a thirty-year sentence for manslaughter of the unborn child.
After conducting a penalty phase hearing, the circuit court sentenced Slawson to thirty years in prison on the manslaughter with a firearm count and, consistent with the jury's recommendation, sentenced Slawson to death on all four first-degree murder counts.[1] In imposing the death sentence, the trial court found as an aggravating factor as to each of the four murders that Slawson had been convicted of three other contemporaneous capital felonies. See id. at 257. Additionally, the court found the murder of Peggy Wood to be especially heinous, atrocious, or cruel (HAC). See id. In statutory mitigation, *494 the court found (1) no significant history of prior criminal activity, although according to Slawson's admissions and statements to mental health experts, he used illegal drugs habitually for years; (2) in the opinion of a defense expert, Slawson's capacity to conform his conduct to the requirements of law was substantially impaired; and (3) in the opinion of a defense expert, the murders were committed while Slawson was under the influence of extreme mental or emotional disturbance. See id. In non-statutory mitigation, the court found that Slawson was abused as a child and he was capable of acts of kindness and could be a friendly person. See id. This Court affirmed Slawson's convictions and sentences on direct appeal, see id. at 256, and the United States Supreme Court denied certiorari review on June 27, 1994. See Slawson v. Florida, 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994).
On September 12, 1995, collateral counsel (CCR, now CCRC-M) petitioned this Court for a writ of mandamus and moved for an extension of time to initiate postconviction proceedings on Slawson's behalf. The petition alleged that collateral counsel had been unable to meet with Slawson based on the revocation of Slawson's front cuff pass. Specifically, the petition alleged that due to a medical condition, Slawson would not leave his cell because he could not have his hands cuffed behind his back without experiencing pain. The petition requested relief in the form of the reissuance of a front cuff pass and an extension of time to file a motion for postconviction relief. The State filed a response, collateral counsel replied, and this Court denied relief on February 22, 1996. See Slawson v. Singletary, 670 So.2d 940 (Fla. 1996).
On September 15, 1995, while the above petition was pending in this Court, CCRC-M filed an unverified rule 3.850 motion in the circuit court with special request for leave to amend. CCRC-M asserted in the motion that the motion was incomplete and unverified based primarily on the revocation of Slawson's front cuff pass. A Huff[2] hearing was scheduled for May 31, 1996, but before that hearing could be held, CCRC-M moved for a continuance and to compel the chapter 119 disclosure of records from several entities, including Dr. Mark Montgomery and the Tampa Police Department. The hearing was continued until July 24, 1996, at which time the court set a date for the filing of an amended rule 3.850 motion and determined that the information sought from Dr. Montgomery was not subject to chapter 119 disclosure. On August 22, 1996, the court ordered the Tampa Police Department to provide CCRC-M with certain public records within 10 days.
On November 1, 1996, collateral counsel raised 28 claims in an amended, unverified rule 3.850 motion.[3] Along with the amended motion, CCRC-M filed a verification *495 certificate, executed by counsel, which asserted that Slawson was incompetent and that all matters alleged in the amended motion were true and correct. The amended motion contained allegations different from the original rule 3.850 motion as to why Slawson would not meet with counsel; instead of relying on the revocation of Slawson's front cuff pass, the motion now asserted:
Mr. Slawson has a long history of mental health complications culminating in his current incompetence. Mr. Slawson refuses to leave his cell for legal visits, medical evaluations and psychological evaluations. Postconviction counsel retained a mental health expert, and he has reviewed Mr. Slawson's psychiatric history, background material, and conversed with postconviction counsel *496 concerning Mr. Slawson's written interactions and refusals to leave his cell. This expert diagnosed Mr. Slawson as paranoid schizophrenic, and determined that he is unable to consult with his lawyer with a reasonable degree of rational understanding and lacks a rational and factual understanding of his postconviction proceedings. Within a reasonable degree of medical certainty, this expert can say that Mr. Slawson has become so paranoid and delusional that he is incapable of trusting his attorneys, family members or anyone else who may be considered a natural ally.
Based primarily on Slawson's alleged incompetency, all but two of the claims asserted in the amended rule 3.850 motion contained the qualification that CCRC-M could not fully investigate and plead such claims until Slawson became competent.[4] The State responded to Slawson's amended motion on November 12, 1996, requesting that the court deny claims 3, 5, and 28 on the merits, dismiss claims 7, 9, 10, 12, 15, 17, 18, 19, 21, 22, 23, 24, and 25 as procedurally barred, and summarily deny claims 1, 2, 4, 6, 8, 11, 13, 14, 16, 20, 26, and 27 as insufficiently pled. Specifically regarding the competency issue raised in claim 1, the State argued that such claim was (1) insufficiently pled due to the anonymity of the mental health expert retained by CCRC-M and the lack of sufficient facts supporting an incompetency finding; (2) without merit because, under Jackson v. State, 452 So.2d 533 (Fla.1984), Slawson was not required to be competent during postconviction proceedings; and (3) refuted by the record because it was clear that CCRC-M had met with Slawson regarding the revocation of his front cuff pass, evidencing the fact that Slawson would meet with counsel whenever he saw fit.
On December 20, 1996, a successor trial judge conducted a Huff hearing to determine whether any of the claims raised by Slawson warranted an evidentiary hearing. The hearing focused on the competency claim. Collateral counsel argued that Slawson's incompetency prevented him from providing counsel with facts concerning his abuse as a child, his prior head injuries and the effects therefrom, and his relationship with trial counsel. The State argued that Slawson's competency claim allegations were insufficient and that, pursuant to Jackson, Slawson was not entitled to a competency determination. After hearing the parties' arguments, the court permitted Slawson to proceed with his unverified motion but denied all of his claims, including his competency claim. On January 13, 1997, the court issued an order memorializing its earlier ruling, stating the following, in pertinent part:
The first claim in the Motion asserts that an evidentiary hearing is necessary due to the Defendant's alleged current incompetence. At the Huff hearing, counsel for Defendant requested that this Court either hold an evidentiary hearing as to the Defendant's present competency or hold this proceeding in abeyance until the Florida Supreme Court issues an opinion in [Carter v. State, 706 So.2d 873 (Fla.1997) (issued November 17, 1997, rehearing denied March 12, 1998)], addressing the competency issue. The Court denied these *497 requests, but indicated the need for a competency hearing would be readdressed if an evidentiary hearing was granted as to any of the other claims in the Motion. Counsel for Defendant indicated that the remaining claims could not be developed adequately without guidance from the Defendant and resolution of the competency concern.
The Court hereby finds that the remaining claims set forth in the Motion are procedurally barred, without merit, or otherwise insufficient to warrant the granting of an evidentiary hearing, for the reasons stated in the State's response to the Motion. It is, therefore, ORDERED AND ADJUDGED that the Defendant's Motion to Vacate Judgments of Convictions and Sentences is hereby DENIED.
The court did not attach any portions of the record to its order in support of its summary denial of Slawson's motion, and CCRC-M filed a notice of appeal on Slawson's behalf on February 20, 1997.
After receiving the notice of appeal, this Court scheduled Slawson's case for oral argument on September 1, 1998. Prior to oral argument, however, Slawson filed a pro se "Motion to Relinquish Jurisdiction" in this Court. Consistent with the motion's title, Slawson requested that we relinquish jurisdiction over his case so that the circuit court could rule on the pro se "Motion for Withdrawal and Termination of Appeal" that he had filed in that court. After considering Slawson's motion, we issued an order on August 28, 1998, temporarily relinquishing jurisdiction to the circuit court for a period of 60 days so that the trial court could conduct a hearing on Slawson's withdrawal motion. We further ordered that Slawson be present at the hearing and that the circuit court supplement the record with any documents and transcripts resulting from the hearing.
As directed, the case was returned to the circuit court and the successor trial judge conducted a hearing on Slawson's withdrawal motion on September 28, 1998. The trial judge first reviewed the procedural history in Slawson's case, and when she questioned Slawson concerning the rule 3.850 motion filed on his behalf, Slawson expressed a general lack of knowledge regarding the motion or any proceedings on his behalf, although he did state that he had "heard rumors" that there was an appeal in his case pending before this Court. Slawson indicated that he understood his right to appeal the summary denial of his rule 3.850 motion and that this Court could disagree with the circuit court's ruling. He also indicated that he understood what waiving collateral counsel and proceedings would mean, and he expressed his displeasure with CCRC-M. On numerous occasions, the trial judge questioned Slawson regarding whether he wanted to waive only representation by CCRC-M, or whether he also wanted to waive his collateral proceedings and dismiss his appeal. Although Slawson continually expressed his displeasure with CCRC-M, he also consistently indicated that he wished to dismiss the appeal pending in this Court and forego any further collateral proceedings.
Additionally, in response to questions posed by the trial court, Slawson elaborated on his educational and employment background. This recitation demonstrated that Slawson had a GED equivalency certificate and approximately one-and-one-half years of college studies in business administration; he served in the Navy for slightly over two years as an operations specialist and received an honorable discharge; and he held various odd jobs after leaving the Navy, including working as a front-end alignment technician, general vehicle mechanic, metal building erector, *498 miscellaneous steel erector, and iron worker. Slawson indicated that he was 35 at the time the murders were committed, and he was 43 at the time of the hearing. At the conclusion of the hearing, the trial court determined that Slawson was competent and that he had "freely, intelligently, and knowingly" waived his right to counsel, and that he had dismissed all proceedings on his behalf. On October 5, 1998, Judge Allen entered a written order reflecting that determination and then supplied this Court with the transcript and all documents resulting from the September 1998 hearing.
After receiving such information, we considered Slawson's case and decided that Slawson should receive a mental health evaluation as a predicate to determining his competency to waive collateral counsel and collateral proceedings. Accordingly, we issued an order on December 17, 1998, stating, in pertinent part:
After reviewing Slawson's case, this Court finds it necessary to remand to the circuit court for Slawson to undergo a mental health evaluation to aid in determining his competency. After such a mental health evaluation is conducted, Judge Allen shall once again determine whether Slawson is competent to make a knowing, intelligent, and voluntary waiver of his collateral counsel and proceedings. If Judge Allen finds that Slawson is competent to make a knowing, intelligent, and voluntary waiver, then she shall report that finding to this Court. If Judge Allen finds that Slawson is not competent to make a knowing, intelligent, and voluntary waiver, she shall report that finding to this Court as well.
Accordingly, the present case is hereby remanded to the Hillsborough County Circuit Court for proceedings consistent with this order. The proceedings on remand are to be conducted within 60 days from the date of issuance of this order, and the record on appeal shall be supplemented with any documents resulting from those proceedings.
Pursuant to our instructions, the trial court appointed Dr. Michael S. Maher and Dr. Sidney Merin to evaluate Slawson, both of whom had testified as defense experts during the guilt phase of Slawson's trial.[5] Dr. Maher filed a written report finding that Slawson was not competent to waive collateral counsel and collateral proceedings, while Dr. Merin filed a written report finding that Slawson was competent to do so. The trial court then appointed a third mental health professional, Dr. Walter E. Afield, to evaluate Slawson, and Dr. Afield filed a written report finding Slawson competent to represent himself. After receiving these reports from the mental health professionals, the trial court brought the parties together on March 12, 1999,[6] during which both the State and Slawson stipulated to the findings in the mental health professionals' reports. Counsel for CCRC-M argued that (1) this Court's order remanding for a mental health evaluation nullified Slawson's prior waiver; (2) Dr. Afield's evaluation failed to comply with Judge Allen's order appointing him, with the Florida Rules of Criminal Procedure, and with this Court's decision in Carter; and (3) none of the mental *499 health professionals was present at the hearing. Slawson objected to the presence of counsel for CCRC-M and stated that he did not recall any part of this Court's order negating any part of the order granting his prior written waiver motion. On March 19, 1999, Judge Allen entered a written order finding that Slawson "is competent to make a knowing, intelligent, and voluntary waiver of his right to collateral counsel and proceedings,"[7] relying exclusively upon written reports and without conducting an evidentiary hearing.
After receiving Judge Allen's order of March 19, 1999, we issued another order, dated July 2, 1999, requesting that CCRC-M, the State, and Slawson file briefs "regarding Judge Allen's competency determination and the validity of Slawson's waiver of collateral counsel and collateral proceedings." The parties completed such briefing, and we received oral argument in Slawson's case on April 3, 2000.
Subsequent to receiving oral argument, we noted that Judge Allen's determination of Slawson's competency to waive his rights as to both collateral counsel and to all collateral proceedings on his behalf was made without the benefit of live testimony from the court-appointed mental health experts or adversarial testing. We became convinced that Slawson should have the opportunity for an adversarial testing that would involve the in-court testimony of the very experts who were to make recommendations to the trial court regarding Slawson's competency to waive his rights which would produce such significant consequences. Therefore, by order dated June 21, 2000, we relinquished jurisdiction in Slawson's case to the circuit court for the purpose of conducting an evidentiary hearing "to afford the opportunity to any participant to present the testimony of [court-appointed mental health experts] Dr. Michael S. Maher, Dr. Sidney Merin, and Dr. Walter Afield," with the purpose of such hearing to be "directed exclusively to the issue concerning whether Newton Slawson is competent to make a knowing, intelligent and voluntary waiver of his collateral counsel and proceedings."
Pursuant to our order, the circuit court conducted the evidentiary hearing.[8] Both sides seized the opportunity to question the three court-appointed mental health experts. Drs. Merin and Afield both adhered to their previous diagnoses and statements that Slawson was competent to make the decision to waive his rights both to collateral counsel and to having collateral proceedings conducted on his behalf. They also indicated that Slawson fully understood the ramifications of making such a waiver.[9]
When Dr. Maher testified during the evidentiary hearing, he initially adhered to his original diagnosis and statement that Slawson was not competent to waive his *500 rights to collateral counsel and collateral proceedings. However, during the initial phase of his testimony, Dr. Maher also stated that his opinion regarding whether Slawson was competent to waive his rights to collateral counsel and collateral proceedings was based in some measure on statements that Slawson had made to him regarding disciplinary incidents in which Slawson was involved while on death row. Dr. Maher indicated that he had not had the opportunity to conduct a thorough review of Slawson's relevant prison records, and that Slawson himself was the primary source of information regarding the occurrence of any disciplinary incidents. At the request of counsel for CCRC-M, Judge Barbas continued the hearing to allow Dr. Maher and all parties in the matter to review Slawson's medical, psychiatric, and disciplinary records from Florida State Prison.[10]
When the hearing continued, Dr. Maher stated that after conducting a careful review of Slawson's prison records and another interview with Slawson, he was compelled to change his prior opinion regarding Slawson's competency to waive his rights to collateral counsel and proceedings. Expecting to find indications in the reports to support his prior diagnosis that Slawson suffered from "delusional beliefs" that would render him incapable of representing himself in collateral proceedings, Dr. Maher stated that instead he found nothing to show that Slawson was incompetent to make the decision to waive his rights. Specifically, as to the disciplinary reports, Dr. Maher stated that they were "entirely mundane in the sense that they were the kind of reports that are typical of common minor conflict with authority between inmates and authority figures in the prison," and that "they gave no indication whatsoever of delusional beliefs." Dr. Maher concluded that not only did Slawson understand the ramifications of waiving his right to collateral counsel, but also that he was competent to make the decision to do so.
By order dated October 25, 2000,[11] the circuit court outlined for this Court that because there was no dispute among Drs. Merin, Afield, and Maher regarding the issue, it therefore found that Slawson was competent to waive his right to collateral counsel and proceedings.[12] The circuit court also conducted a Faretta[13] hearing on November 9, 2000, in which it determined, after questioning Slawson, that his waiver of his rights was knowing, intelligent, and voluntary. By order dated January 19, 2001, we granted the motion to supplement the record with the transcript of the Faretta hearing; in this order we also extended to January 29, 2001, the deadline for parties in the matter to submit briefs addressing only the issue that was considered on relinquishment. The *501 parties have completed such briefing,[14] and we now address the validity of the circuit court's order finding Slawson to be competent to waive his rights to collateral counsel and proceedings.

II. ANALYSIS
CCRC-M makes three assertions in its latest brief to this Court. First, CCRC-M asserts that we should resolve issues raised in the appeal of the trial court's summary denial of postconviction relief before we approve any waiver by Slawson of his rights to collateral counsel and collateral proceedings. The next interrelated arguments are that the circuit court erred in accepting Slawson's waiver of collateral counsel and proceedings, and that the circuit court erred in its finding that Slawson was competent to waive his rights to collateral counsel and proceedings.
Regarding the first position, we have previously allowed competent death-sentenced individuals, who have made a knowing, intelligent, and voluntary waiver of their rights to collateral counsel and proceedings, to implement that waiver without a resolution of the collateral claims that were pending before us. In Castro v. State, 744 So.2d 986, 986 (Fla.1999), Edward Castro, a death-sentenced individual, repeatedly indicated his desire "to waive his right to representation through CCRC and to waive his right to file postconviction motions in [his] case." After determining that the trial court engaged in the required inquiries regarding Castro's competency to make the decision and whether he made a knowing, intelligent, and voluntary waiver, we upheld the trial court's decision to allow him to discharge CCRC and to withdraw his rule 3.850 motion. See also Sanchez-Velasco v. State, 702 So.2d 224 (Fla.1997) (upholding trial court's order which discharged death-sentenced individual's collateral counsel and dismissed pending rule 3.850 petition, after determining that trial court made required competency and Faretta inquiries). We see no material differences on this issue among the instant case, Castro, and Sanchez-Velasco. Therefore, we determine that we are not required to resolve issues pending in Slawson's postconviction motion before we consider the validity of the trial court's order regarding his competency to waive his rights to collateral counsel and proceedings.
CCRC-M next contends that the circuit court erred in accepting Slawson's waiver of his rights to collateral counsel and proceedings. In its basic form, CCRC-M argues that because Slawson has not seen or read the 3.850 motion filed on his behalf and has refused to discuss his case with CCRC-M attorneys, the circuit court cannot accept his waiver because it is not knowing, intelligent, and voluntary. Moreover, CCRC-M contends that the circuit court's actual finding that Slawson is competent to waive his rights is in error. We disagree on both points.
In Durocher v. Singletary, 623 So.2d 482, 483 (Fla.1993), we determined that a competent capital defendant may waive collateral counsel and collateral proceedings. Accord Castro v. State, 744 So.2d 986 (Fla.1999) (following Durocher); *502 Sanchez-Velasco v. State, 702 So.2d 224 (Fla.1997) (same). We then proceeded to explain the general procedures to be followed when a capital defendant requests such a waiver:
[W]e direct the trial judge forthwith to conduct a Faretta-type evaluation of Durocher to determine if he understands the consequences of waiving collateral counsel and proceedings. If the judge finds a proper waiver by Durocher, he shall report that finding to this Court and the instant petition will be dismissed. If, however, Durocher does not understand the consequences of his decision, the judge shall report that fact to this Court and CCR will be allowed to proceed on Durocher's behalf. The attorney general's office and CCR may attend the evaluation, but may not participate unless permitted to do so by the judge. If the Faretta-type hearing raises questions in the judge's mind about Durocher's competency, he may order a mental health evaluation and make a competency determination thereafter.
Durocher, 623 So.2d at 485. We also established that the relevant test for competency in the context of waiving collateral counsel and collateral proceedings in Florida is whether the person seeking waiver has the capacity to "understand[] the consequences of waiving collateral counsel and proceedings." Id. Further, we made clear in Durocher that the party challenging the defendant's waiver request bears the burden of proving that the defendant is incompetent. See id. (stating that "a next friend has the burden `to establish the propriety of his status and thereby justify the jurisdiction of the court,'" quoting Whitmore v. Arkansas, 495 U.S. 149, 164, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). Finally, we provided in Castro that an abuse of discretion standard applies when reviewing the trial court's determination regarding a capital defendant's competency to waive collateral counsel and proceedings. See 744 So.2d at 989.
In Slawson's case, the circuit court followed the procedures outlined in Durocher and determined that Slawson was competent to make a knowing, intelligent, and voluntary waiver of collateral counsel and proceedings. We subsequently determined that it would be helpful for Slawson to undergo a mental health evaluation to aid the circuit court in determining his competency, and the circuit court properly followed our instructions, appointing three mental health professionals to evaluate Slawson. As stated above, the reports and conclusions of Drs. Merin, Afield, and Maher have been properly subjected to adversarial testing in an evidentiary hearing. All three experts have concluded that Slawson is competent to waive his rights to collateral counsel and proceedings. After the evidentiary hearing, the circuit court once again determined that Slawson was competent to make a knowing, intelligent, and voluntary waiver of his rights to collateral counsel and proceedings. The trial court thereafter also conducted a Faretta hearing.
After carefully reviewing the facts and arguments presented, we determine that the circuit court did not abuse its discretion in finding Slawson competent to waive collateral counsel and collateral proceedings. The circuit court has extensively questioned Slawson regarding his knowledge of his pending proceedings, the rights he would be waiving, and the consequences of making such a waiver. Slawson's responses to the questions posed by the circuit court demonstrate that he comprehends his legal options and the consequences of a waiver. Although it is clear that Slawson is disenchanted with the perceived inadequacy of the representation being provided to him by CCRC-M, that fact alone does not negate his ability to *503 waive both collateral counsel and collateral proceedings. In Sanchez-Velasco, we determined that a death-sentenced individual's seemingly contradictory positions in indicating the ineffectiveness of his collateral counsel in asserting the individual's innocence on one hand, yet also expressing a desire to waive his rights to collateral counsel and proceedings on the other, did not cause this Court to doubt the individual's competency to waive his rights to collateral counsel and proceedings. See Sanchez-Velasco, 702 So.2d at 228. The agreement of all three mental health experts regarding Slawson's competency to waive his rights provides an appropriate foundation for the circuit court's order. Based on the presumption of competency that attaches from trial, see Durocher, 623 So.2d at 484, the extensive colloquies in which the circuit court engaged with Slawson pursuant to Durocher, and the reports and testimony of Drs. Merin, Afield, and Maher, we determine that the circuit court properly accepted Slawson's waiver and that it did not abuse its discretion in finding Slawson competent to waive collateral counsel and proceedings.[15]
Finally, we address CCRC-M's assertion that we should recede from our prior decision in Hamblen v. State, 527 So.2d 800 (Fla.1988), in which we held that "there was no error in not appointing counsel against Hamblen's wishes to seek out and to present mitigating evidence and to argue against the death sentence." Id. at 804. However, the present case concerns a waiver of collateral counsel and collateral proceedings, while Hamblen concerned waiver of a presentation of mitigating evidence during the penalty phase of the trial. Cf. Minerva v. Singletary, 830 F.Supp. 1426, 1430 n. 2 (M.D.Fla.1993) (noting that the concerns expressed by this Court in Klokoc v. State, 589 So.2d 219 (Fla.1991), which addressed waiver of a direct appeal in a capital case, "do not address the question of waiver of counsel on collateral review"). In this case, counsel represented Slawson throughout the guilt and penalty phases of the trial, as well as on direct appeal to this Court. The defense presented a case in mitigation, and the trial court found three statutory mitigating circumstances and several nonstatutory mitigating circumstances. See Slawson, 619 So.2d at 257. Based on the substantial differences between this case and Hamblen, and our recent discussion of the issue in Muhammad v. State, 782 So.2d 343 (Fla.2001), we decline to again revisit that issue here.

III. CONCLUSION
Based on the above, and consistent with our prior decisions in Durocher, Sanchez-Velasco, and Castro, we affirm the circuit court's order finding Slawson competent to make a knowing, intelligent, and voluntary waiver of collateral counsel and collateral proceedings. We further affirm the circuit court's order discharging CCRC-M from representing Slawson, and we dismiss with prejudice the appeal currently pending in this Court from the summary denial of Slawson's initial rule 3.850 motion.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
*504 WELLS, C.J., concurs in result only.
QUINCE, J., recused.
NOTES
[1] The jury recommended the death penalty by a vote of eight to four with regard to the murder of Gerald Wood, the father. As to the murder of Jennifer and Glendon Wood, the children, the jury recommended the death penalty by a vote of seven to five. Finally, the jury recommended the death penalty by a vote of nine to three on the conviction related to the murder of Peggy Wood, the mother.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] The amended rule 3.850 raised the following claims [restated]: (1) Slawson is incompetent under the standard set forth in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), to proceed with postconviction matters; (2) Slawson has been deprived access to judicial records in violation of article I, section 24 of the Florida Constitution, and Florida Rule of Judicial Administration 2.051; (3) rule 3.851 of the Florida Rules of Criminal Procedure is unconstitutional; (4) Slawson's trial counsel was ineffective for failing to object to Dr. Samenow's testimony and failing to litigate other guilt phase issues; (5) Rule Regulating The Florida Bar 4-3.5(d)(4) unconstitutionally prohibits collateral counsel from interviewing Slawson's jury to discover any misconduct; (6) Slawson is innocent of first-degree murder and has been denied an adversarial testing; (7) the trial court unconstitutionally denied Slawson his right to a fair trial by denying his change of venue requests; (8) Slawson did not receive adequate mental health assistance at trial as required by Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (9) the trial court improperly instructed Slawson's jury regarding the vote required for imposition of the death sentence, and trial counsel was ineffective for failing to object to this error; (10) the trial court improperly considered nonstatutory aggravating factors and the prosecutor presented the jury with inflammatory and improper comments and arguments; (11) Slawson was deprived of an adversarial testing and effective assistance of counsel during the penalty phase of his trial due to counsel's failure to object to Dr. Samenow's testimony, counsel's failure to present available mitigating evidence and provide adequate background information to mental health experts, and counsel's failure to object to erroneous jury instructions; (12) Slawson's death sentences are unconstitutional because the penalty phase jury instructions erroneously forced Slawson to prove that death was improper; (13) newly discovered evidence shows that Slawson's convictions and sentences are constitutionally unreliable; (14) trial counsel was ineffective during voir dire; (15) Slawson's death sentences are fundamentally unfair and unreliable due to the prosecutor's inflammatory comments and introduction of victim impact evidence; (16) the prosecution unconstitutionally withheld material, exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (17) Florida's capital sentencing scheme denies Slawson due process of law and constitutes cruel and unusual punishment under the Eighth Amendment; (18) the trial court erroneously instructed the jury on the HAC aggravator, and this Court's harmless error analysis of the issue on Slawson's direct appeal was not meaningful in light of new case law; (19) the trial court violated Slawson's Eighth Amendment rights by refusing to find and weigh the mitigating circumstances established in the record, and trial and appellate counsel were ineffective in failing to litigate this issue at trial or on direct appeal; (20) Slawson's trial counsel was ineffective for failing to present Slawson's good behavior while awaiting trial as mitigating evidence, and appellate counsel was ineffective for failing to raise the issue on direct appeal; (21) the prosecution's introduction of prejudicial crime scene photographs rendered Slawson's convictions and sentences fundamentally unreliable, trial counsel was ineffective in failing to object or effectively argue against the admission of the photographs, and appellate counsel was ineffective by failing to adequately litigate the issue; (22) Slawson was denied appropriate appellate review because no reliable transcript of his trial exists; (23) the trial court erroneously instructed the jury on the standard by which they were to judge expert testimony; (24) the trial court and prosecutor unconstitutionally suggested to the jury that the law required a recommendation of death; (25) section 921.141(5), Florida Statutes (1989), defining the CCP and HAC aggravators, was vague and overbroad at the time of Slawson's sentencing, and the trial court did not provide an adequate narrowing instruction to cure the statute's unconstitutionality; (26) the cumulative weight of the errors which occurred during all phases of Slawson's trial render his convictions and sentences unreliable; (27) Slawson was incompetent under the Dusky standard to proceed at trial, trial counsel was ineffective for failing to file a motion for a competency determination, and the trial court failed to conduct a competency hearing on its own motion as provided by rule 3.210(b) of the Florida Rules of Criminal Procedure; and (28) the court erred in finding at the July 24, 1996, hearing that the records created by Dr. Mark Montgomery were not public records subject to chapter 119 disclosure.
[4] Claims 1 and 3 were the only claims not containing the incompetency qualification; claim 1 presented substantive argument concerning Slawson's incompetency, and claim 3 asserted the unconstitutionality of rule 3.851. See supra note 3. Every claim containing the competency qualification also referred to claim 28 concerning outstanding public records, see id., implying that the claims could not be fully investigated and pled until receipt of those records.
[5] Both Dr. Merin and Dr. Maher testified during the guilt phase of the trial that Slawson did not have the capacity to form a premeditated intent to kill the Wood family, but both doctors agreed that Slawson did not meet Florida's test for insanity at the time of the crime.
[6] This hearing was timely despite being held after the expiration of the original 60-day time limit because we issued an order on February 23, 1999, extending the time to complete the proceedings on remand to and including April 16, 1999.
[7] After Judge Allen entered her written report, Slawson filed in the circuit court a "Motion for Injunctive Relief Against the Offices of CCR." In his motion, Slawson argued that CCRC-M should be enjoined from further investigating his case in violation of the circuit court's orders. The impetus for Slawson's motion was a letter dated March 1, 1999, from Chief Assistant CCRC Michael P. Reiter, which informed Slawson that Mr. Reiter would be serving as interim lead attorney on Slawson's case and that "[y]our legal team continues to maintain and investigate your case." Slawson has provided this Court with a copy of his motion for injunctive relief, as well as a copy of the letter from CCRC-M.
[8] This evidentiary hearing and subsequent proceedings in the case became the responsibility of Circuit Judge Rex Barbas, due to the death of Judge Allen.
[9] Chronologically, Drs. Merin and Afield testified before Dr. Maher. Dr. Maher was not available to testify on the same day as Drs. Merin and Afield.
[10] The record also indicates that these records were made available to Drs. Merin and Afield.
[11] This order was in response to this Court's order to the circuit court dated October 16, 2000, to report the status of the relinquishment proceedings in Slawson's case.
[12] The following findings of fact were also included in the order: (1) Slawson appreciates the gravity of the charges that were lodged against him; (2) Slawson appreciates the gravity of the sentence imposed against him; (3) Slawson understands the adversarial nature of the legal process; (4) Slawson has the ability to disclose facts that are pertinent to the relevant legal proceedings; (5) Slawson has the ability to manifest appropriate courtroom behavior; and (6) Slawson has the ability to "testify relevantly." We disagree with the contention of CCRC-M that these findings were merely conclusory and were not grounded on the specific facts of Slawson's case.
[13] See Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[14] CCRC-M in its latest brief states that it has "consistently taken the position in [the] relinquishment proceedings that it is not representing Mr. Slawson. Rather, CCRC's participation in these proceedings is authorized and delimited by the language contained in certain Orders issued by this Court. Also, CCRC was counsel of record when this case was before this Court on review of the lower court's summary denial of Slawson's original motion for postconviction relief, and CCRC has never filed a motion to withdraw with this Court." (Emphasis in original.)
[15] We also reject CCRC-M's contention that Slawson's case is factually similar to Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), in which the United States Supreme Court determined that it was reversible error for a state trial judge to accept a defendant's plea of guilty without an affirmative showing that the plea was made intelligently and voluntarily. No plea of guilty is involved in Slawson's case; moreover, the circuit court determined that his waiver of rights to collateral counsel and proceedings was made knowingly, intelligently, and voluntarily.