716 So.2d 761 (1998)
Nicholas Lynn HARDY, Appellant,
v.
STATE of Florida, Appellee.
No. 87469.
Supreme Court of Florida.
June 11, 1998.
Rehearing Denied September 4, 1998.
*762 Carey Haughwout of Tierney & Haughwout, West Palm Beach, for Appellant.
Robert A. Butterworth, Attorney General, and Randall Sutton, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Nicholas Lynn Hardy. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
At 11 p.m. on February 25, 1993, Sergeant James Hunt, an officer with the Palm Beach County Sheriff's Office, notified the police dispatcher by radio that he was investigating an alarm call at a bank. Shortly thereafter, Hunt sent a radio transmission that the bank's alarm was malfunctioning and that he was going back into service. At 11:04 p.m., Hunt radioed that he had encountered four suspicious juveniles and requested backup. Deputy Fox reached the scene three minutes later, only to find that Sergeant Hunt had been shot and that his gun was missing. The police immediately began an intensive search of the area, which included the use of a helicopter with an infrared light. One of the young men, Ricky Rodriguez, was found hiding in the bushes. Thereafter, a canine unit discovered the appellant, Nicholas Hardy, who had shot himself in the head.
At the trial, Rodriguez testified that he and Hardy, together with Glen Wilson and Scott Allen, had been driving around when their car broke down. They pushed it into a supermarket parking lot and began walking through the lot. Hardy was carrying a stolen.38-caliber handgun. Sergeant Hunt stopped the four young men and began to pat them down. While Hunt was patting down Rodriguez, Hardy shot Hunt twice in the head at close range. As the others fled, Hardy came back and took Hunt's service revolver, a nine-millimeter pistol, with which he later shot himself. Wilson and Allen corroborated Rodriguez's version of the events.
The self-inflicted gunshot wound entered the roof of Hardy's mouth and exited through the top of his head. Hardy remained in a coma for several weeks and was hospitalized for over a month and a half, after which he was released to his mother, a certified RN, on house arrest. Over time, Hardy gradually regained the ability to walk and speak. In July of 1993, Hardy was remanded to the county jail based on his improved condition.
Hardy was ultimately found to be competent and his trial commenced on October 23, 1995. At the conclusion of the guilt phase of the trial, the jury found Hardy guilty of first-degree murder. At the conclusion of the penalty phase, the jury recommended death by a vote of nine to three. The trial court found that the following aggravating factors applied to the murder: (1) the victim was a law enforcement officer engaged in his official duties; and (2) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The trial court found that Hardy's age of eighteen qualified as a statutory mitigating factor and gave it some weight. He also found the following nonstatutory mitigating factors: (1) Hardy's impoverished and physically and emotionally abusive childhood (given little weight); (2) Hardy's attempt to punish himself by self-infliction of a gunshot wound to his head (given little weight); (3) that the court had the option of sentencing Hardy to life without parole (given some weight); (4) Hardy's good and compliant behavior, making him *763 unlikely to endanger others while in prison and likely to have no problem adapting to a prison setting (given considerable weight); and (5) Hardy is brain-damaged as a result of his suicide attempt (given considerable weight). The trial court also found that the aggravating circumstances, even if each was standing alone, far outweighed the mitigating circumstances and sentenced Hardy to death.
Hardy raises four guilt-phase issues and five penalty-phase issues on appeal.

The Guilt Phase
Hardy contends that the trial court erred in finding that he was competent to stand trial. The issue of Hardy's competency was first visited in a hearing held in August of 1993, wherein Hardy's treating neuropsychologist, the court-appointed psychologist, and the psychologist hired as an expert by the defense all agreed that Hardy was incompetent to stand trial and the trial court declared Hardy incompetent. Because of testimony presented at the competency hearing indicating that Hardy was retarded due to his neurological injuries, the trial court held a placement hearing in December of 1993, where it was determined that Hardy should be sent to the Mentally Retarded Defendant Program at Florida State Hospital. While in this program, Hardy received training in trial procedure, crimes and consequences, self-management skills, and language skills. After fourteen months, the hospital staff advised the court that it now believed Hardy to be competent.
In February of 1995, a second competency hearing was held. Dr. McKenzie, senior psychologist at the Mentally Retarded Defendant Program, testified that Hardy's full-scale IQ was now 81 with a verbal IQ of 74 and a performance IQ of 96. Dr. McKenzie further testified that Hardy denied any memory of events but was otherwise competent to stand trial as long as questions were kept simple and to the point. Dr. Barnard, a psychologist under contract with HRS Developmental Services, testified that Hardy was functioning on a borderline intellectual range with a full-scale IQ of 77, a verbal IQ of 72 and a performance IQ of 89. Dr. Barnard opined that Hardy was competent to stand trial, though he had difficulty reading and took time to respond to questions. Dr. Sternthal, the defense's expert, testified that Hardy was incompetent, could not understand or process information in the courtroom, could not withstand cross-examination, continued to have memory problems, and did not appreciate the seriousness of the offense and continued to be euphoric. The trial court ruled that Hardy was competent to stand trial.
A third competency hearing was held during the middle of jury selection. Dr. Heiken, a clinical psychologist, testified for the defense that Hardy was not competent because he was unable to process information, that he could repeat information but could not explain what had occurred, and that he was well trained to give back responses but did not have an understanding of what he was saying. Dr. Cheshire, who had originally found Hardy incompetent before he was sent to the state hospital, reexamined him the night before the third competency hearing. Dr. Cheshire testified that Hardy now met the criteria for being considered competent to stand trial. He also believed that Hardy was being evasive or cunning in his answers to the doctor's questions. Dr. Barnard, who had reexamined Hardy, testified once again that Hardy was competent to stand trial. While Hardy had difficulty expressing himself due to aphasia, he had the ability to process information and made appropriate responses. From a review of the jail log, Dr. Barnard noted that Hardy had been assisting people, playing cards, chess and checkers, watching television, and discussing his case with fellow inmates. Dr. Barnard agreed that it would be helpful if the proceedings were slowed down and if a third person were available to explain to Hardy the things that were occurring in the trial. The trial court again found that Hardy was competent to stand trial.
In determining whether a defendant is competent to stand trial, the trial court must decide whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as a factual understanding of the proceedings against him." Dusky v. *764 United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); see also § 916.12(1), Fla. Stat. (1993); Fla. R.Crim. P. 3.211(a)(1). In situations where there is conflicting expert testimony regarding the defendant's competency, it is the trial court's responsibility to consider all the evidence relevant to competency and resolve the factual dispute. Hunter v. State, 660 So.2d 244, 247 (Fla.1995), cert. denied, 516 U.S. 1128, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996); Watts v. State, 593 So.2d 198, 202 (Fla.1992). The trial court's competency decision will be upheld absent a showing of an abuse of discretion. Hunter, 660 So.2d at 247; Watts, 593 So.2d at 202.
We find that the trial court properly considered all of the evidence presented below regarding Hardy's competence, including the expert testimony, testimony from jail employees regarding Hardy's abilities to communicate and participate in a number of activities while incarcerated awaiting trial, and the trial court's own observations of Hardy's demeanor and ability to assist defense counsel during jury selection. The trial court noted during the third (and last) competency hearing that it found the testimony of Drs. Heiken and Sternthal to be less credible and gave more weight to Dr. Barnard's testimony based on the fact that Dr. Barnard had examined Hardy both before and after his stay at the Mentally Retarded Defendant's Program. The trial court did not abuse its discretion in determining that Hardy was competent to stand trial. Any contention that the court should have followed Dr. Barnard's suggestion to slow down the proceedings is moot because no complaint was ever made about the pace of the trial.
Hardy's last guilt-phase claim[1] asserts that the trial court erred when it permitted the State to introduce evidence of Hardy's prior statement regarding what would happen if he was involved in a confrontation with police officers. At some point during the two months prior to the murder, Hardy, a mixed-race individual, had made the following statement to a friend while discussing the Rodney King beating incident: "If it ever came down to me and a cop, it was the cop." Hardy argues that this statement was irrelevant to the issues in the case because the statement did not express any intent to kill a police officer and instead merely expressed an intent not to allow himself to be battered by police officers. Hardy alternatively argues that the probative value of the statement was greatly outweighed by its prejudicial effect.
We conclude that the statement was properly admitted to show intent and motivation for the murder. It was not remote in time and it was relevant to the State's contention that Hardy intended to resolve any police confrontation with violence and that he would rather kill than be arrested for being in possession of a stolen gun. See Maharaj v. State, 597 So.2d 786, 790 (Fla.1992) (newspaper articles containing earlier statements of defendant were relevant to establish defendant's motivation and intent). Any doubt about what Hardy intended by his statement was a question of fact that was properly left for the jury to resolve.

Penalty Phase
Hardy first challenges the admission of evidence regarding two shootings that were committed the day before the murder. The testimony reflected that on the day before Sergeant Hunt was killed, Hardy and others had stolen a car and became involved in an incident in which shots were fired at Kenneth Speranza. In another incident, David Cook was shot three times in the back. The State's presentation of this evidence was directed toward the applicability of the cold, calculated, and premeditated (CCP) aggravatorthat Hardy murdered Sergeant Hunt in order to avoid apprehension by the police, based on Hardy's knowledge that he had participated in the crimes and that the police had already recovered the stolen car used to commit the crimes.
Hardy asserts that the collateral crimes evidence was inadmissible because his involvement was not established by clear and *765 convincing evidence. He also argues that even if the evidence was sufficient to prove his participation, it was not relevant to the penalty phase because he was never convicted of either crime.
While no one actually saw who fired the shots at Speranza and Cook, Hardy admitted to Ryan Sexton on the day following the shootings that he was involved in these incidents. Hardy showed Sexton the guns they had used and the two of them even observed the police as they recovered the stolen vehicle. Further, Cook identified Hardy as the driver who had first threatened to shoot him. Thus, the evidence clearly implicated Hardy in the collateral crimes. We conclude that it was properly admitted in support of the State's claim of CCP.
Hardy next contends that there was insufficient evidence to support the finding of CCP. In the sentencing order the trial judge outlined the basis for this finding as follows:
Sometime in 1993 the Defendant told a friend of his, Glen Wilson, during a discussion of the Rodney King incident: "If it ever came down to me and a cop, it was the cop." It came down to that situation on February 25, 1993.
During this same time period, the Defendant, along with Jose Nieves, took what turned out to be the murder weapon, a .38 calibre handgun, from the home of Joseph Ybarra during a burglary.
On February 24, 1993, the Defendant along with some friends stole Robert Forbis' 1990 Cadillac. That same evening, the Defendant proceeded to drive the car while being involved in two drive-by shootings. Kenneth Speranza was shot at and missed. David Cook was shot at by the Defendant and hit three times in the back.
On February 25, 1993, Sgt. James Hunt, an outstanding, experienced officer, responded to an alarm call at Barnett Bank and stopped four young men, including the Defendant, who were running from the general area of the bank. At the time the Defendant was armed with the stolen .38 calibre hand gun, which the Defendant unsuccessfully tried to pass off to one of his buddies. Sgt. Hunt began to pat down the four men. While Sgt. Hunt was doing this, the Defendant faced the situation he had previously prepared his response to. As he had planned, the Defendant took out the .38, walked behind the person being patted down, took aim, and shot Sgt. Hunt two times in the head at close range. Then, as the men fled the scene, the Defendant had the presence of mind to turn back and disarm the dying officer. The officer's weapon was the handgun the Defendant used in a failed suicide attempt in his hiding place while being searched for by law enforcement.
Sgt. James Hunt was killed while investigating a possible robbery and before he could arrest the Defendant for carrying a concealed firearm. The Defendant also knew he had committed other, more serious offenses.
....
Sgt. Hunt was unsuspecting of his danger. The Defendant made no attempt to disarm him or escape prior to the killing, but decided to shoot the officer in the head twice at close range while the officer was off guard, being busy patting down another man. The Defendant had the presence of mind to take Sgt. Hunt's gun afterward....
The Defendant had previously considered and planned what he would do if faced with the situation he found himself confronted with on February 25, 1993.
Upon a review of the record, we conclude that the State did not prove beyond a reasonable doubt that the murder was cold, calculated, and premeditated. To prove this aggravating factor, this Court has recognized that the State must establish four elements. See Jackson v. State, 704 So.2d 500, 504 (Fla.1997); Jackson v. State, 648 So.2d 85, 89 (Fla.1994). The State must prove beyond a reasonable doubt that: (1) the murder was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant had a careful plan or prearranged design to commit the murder before the fatal incident (calculated); and (3) the defendant exhibited heightened premeditation (premeditated); and (4) the defendant had no pretense *766 of moral or legal justification. Jackson, 704 So.2d at 504; Jackson, 648 So.2d at 89. We find that the State in the instant case failed to prove beyond a reasonable doubt either that the murder was cold or that it was calculated.
With respect to coldness, the record establishes that on the night of the murder Hardy and his three companions were driving around until their car broke down. At that time, all four men exited the car. Hardy took with him a .38-caliber gun, which had been stolen from Joseph Ybarra's residence. He attempted to give the gun to one and then another of his companions, but both refused to take it. Shortly thereafter, Hardy and his companions were stopped by Sergeant Hunt. Glen Wilson, one of Hardy's three companions, described Hardy at this time as "paranoid" and "flinching." Hardy knew the officer would find the gun, and it appears that he made a spur-of-the-moment decision to shoot the officer. Moreover, immediately following the shooting, Hardy attempted to take his own life. Suicide is not an action characteristic of someone who reflected on his decision to extinguish the life of another. Accordingly, it is just as likely that Hardy panicked and shot the officer as it is that his actions were the result of calm and cool reflection.
In finding the murder was calculated, the trial court relied primarily on the prior statement made by Hardy. This was a very general statement made several weeks before the murder in reference to what Hardy would do if he were involved in a situation similar to that of Rodney King, who was beaten by police officers. We cannot construe this as sufficient evidence of a cold, calculated, and premeditated plan regarding what Hardy would do if he were ever confronted by a police officer under the circumstances of the present case.
Striking the cold, calculated, and premeditated aggravator leaves only a single aggravating factorthat the victim was a law enforcement officer engaged in the performance of his official duties. On the other hand, the trial court identified Hardy's age of eighteen at the time of the murder as a statutory mitigating factor. Additionally, the trial court gave at least some weight to the nonstatutory mitigators of Hardy's physically and emotionally abusive childhood and Hardy's attempt to punish himself with a self-inflicted gunshot to the head. The trial court gave considerable weight to the nonstatutory mitigators that Hardy now behaves well and would have no problem adapting to a prison setting. The trial court also gave considerable weight to the mitigating factor that Hardy is severely brain damaged as a result of his unsuccessful suicide attempt. The neurological experts that examined Hardy concluded that the brain damage destroyed the qualities that made Hardy human, so that Hardy was no longer the same person who killed Sergeant Hunt.
Based on the single applicable aggravator and the considerable mitigation in this case, we find that death is disproportionate. We therefore affirm the judgment of guilt but reverse Hardy's death sentence and remand for the entry of a sentence of life imprisonment without eligibility for release pursuant to section 775.0823, Florida Statutes (1991).[2]
It is so ordered.
KOGAN, C.J., OVERTON, SHAW and HARDING, JJ., and GRIMES, Senior Justice, concur.
WELLS, J., concurs as to guilt and dissents as to sentence.
ANSTEAD, J., recused.
NOTES
[1] Hardy also asserts that the trial court erred when it allowed the State to peremptorily strike a nineteen-year-old minority juror from the jury panel and when it permitted the State to introduce evidence of Hardy's possession of a stolen.22 rifle. We find that these arguments are devoid of merit and reject them without discussion.
[2] In view of our ruling, Hardy's remaining penalty-phase issues are now moot.