894 So.2d 46 (2004)
Pressley Bernard ALSTON, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-1904.
Supreme Court of Florida.
October 14, 2004.
Rehearing Denied December 13, 2004.
*47 Robert T. Strian, Assistant CCRC, Capital Collateral Regional Counsel, Middle Region, Tampa, FL, for Petitioner.
Charles J. Crist, Jr., Attorney General, and Cassandra K. Dolgin, Assistant Attorney *48 General, Tallahassee, FL, for Respondent.
PER CURIAM.
This case involves the Court-ordered appeal from circuit court orders finding Pressley Bernard Alston, a death row inmate, competent to proceed in postconviction proceedings and allowing Alston to waive his rights to postconviction counsel and relief. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

FACTS AND PROCEDURAL HISTORY
Alston was convicted of first-degree murder, armed robbery, and armed kidnapping and sentenced to death. The facts of his crime and trial are summarized in Alston v. State, 723 So.2d 148, 150-53 (Fla.1998). This Court affirmed his convictions and sentence on September 10, 1998. See id. Review by the United States Supreme Court was not sought. In June 1999, the Capital Collateral Regional Counsel for the Middle Region of Florida (CCRC-M) was appointed as postconviction counsel for Alston and, five months later, filed an unverified "shell" motion for postconviction relief.
In August 1999, Alston sent a letter to the circuit court expressing a desire to represent himself. In November 1999 and February 2000, CCRC-M filed motions to withdraw, alleging Alston refused to meet or work with counsel. The circuit court denied those motions. In May 2000, the circuit court held a hearing regarding Alston's request to represent himself and thereafter directed CCRC-M to continue its representation.
In July 2000, CCRC-M filed a motion for a competency determination. Three months later, the circuit court granted the motion and appointed three experts. The experts, Drs. Umesh M. Mhatre, Wade Cooper Myers, and Robert M. Berland, examined Alston and filed reports. In October 2001, after reviewing the reports, the circuit court found Alston incompetent to proceed, ordered the Department of Corrections (DOC) to file periodic reports with the court regarding Alston, and ordered that Alston be reevaluated 180 days later and every thirty days thereafter. During the period of declared incompetency that followed, Alston's postconviction proceedings remained inactive.
Despite having CCRC-M representation and having been declared incompetent, Alston filed many pro se petitions with this Court from January through October of 2002. Many of the petitions were improperly titled and lacked clarity regarding the specific relief sought.[1] However, one filing, dated July 1, 2002, requested a writ of mandamus ordering the circuit court to conduct a Durocher[2] hearing "to waive all further appeals and the post conviction appeals procedure." This Court denied most of Alston's petitions and, on December 20, 2002, issued the following order:
[T]he Fourth Judicial Circuit Court is ordered to hold a hearing, within 60 days of the date of this order, at which both petitioner and his collateral counsel are present, to determine whether petitioner seeks a Durocher hearing in order to waive all further appeals or wishes to proceed with his pending postconviction proceedings.

*49 If petitioner seeks a Durocher hearing, the trial court is hereby ordered to conduct a hearing pursuant to Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), in order to determine if petitioner understands the consequences of waiving his collateral counsel and postconviction proceedings. See Sanchez-Velasco v. State, 702 So.2d 224, 228 (Fla.1997). If the Durocher hearing demonstrates that a mental health evaluation is required, the trial court shall order a mental health evaluation and make a competency determination. Thereafter, the trial court shall proceed, if appropriate, in accord with our decisions in Sanchez-Velasco, 702 So.2d at 227-28, or Carter v. State, 706 So.2d 873, 875-76 (Fla.1997).
In July through November 2002, Drs. Mhatre, Myers, and Berland reevaluated Alston, and their reports were filed with the circuit court. Pursuant to its previous order, the circuit court had also received eight periodic reports from the DOC. Having received this Court's order, the reevaluation reports, and the DOC reports, the circuit court held a status conference on January 9, 2003, which resulted in the setting of an evidentiary hearing to determine competency. On March 20, 2003, the circuit court held an evidentiary hearing and received testimony from the court-appointed experts and staff from the Union Correctional Institution (UCI). On March 27, 2003, the circuit court issued an order finding Alston competent to proceed.
In accordance with this Court's order, the circuit court held a Durocher hearing on June 6, 2003, at which Judge Aaron Bowden and counsel for both the State and CCRC-M questioned Alston about his request to waive his rights to postconviction counsel and relief. On June 12, 2003, the circuit court issued an order determining that Alston's decision to waive his rights was knowing, intelligent, and voluntary. The circuit court discharged CCRC-M and ordered all motions or petitions for postconviction relief dismissed with prejudice. Unsure how to proceed from there, the circuit court, by letter dated June 12, 2003, informed this Court of its order, forwarding a copy of it and a transcript of the Durocher hearing to this Court "for whatever action the justices may deem appropriate."
Despite having waived his right to postconviction relief, Alston filed another pro se pleading with this Court on June 30, 2003. Alston primarily used the contents of that pleading to argue that his "testimony" at the Durocher hearing established that Assistant State Attorney Angela B. Corey-Lee fabricated the murder case against him. By order dated July 15, 2003, this Court struck that filing as an unauthorized pro se pleading. In response, Alston filed another pro se pleading on August 12, 2003, to "appeal" the order striking his prior pleading. He noted that the circuit court had permitted him to proceed pro se and again urged this Court to investigate his case. On October 15, 2003, this Court issued an order striking Alston's second pleading but additionally requesting CCRC-M and the State to file briefs with this Court regarding the circuit court's competency determination and the validity of Alston's waiver of his rights to postconviction counsel and relief.

REPORTS AND TESTIMONY REGARDING COMPETENCY
The circuit court's initial determination of incompetency was reached solely on the basis of the record; the parties stipulated to waive any hearing on the issue. In the experts' initial reports, Dr. Myers and Dr. Berland concluded that Alston was incompetent to proceed, while Dr. Mhatre concluded that Alston was competent. The *50 circuit court's later determination of competency was based on the experts' reevaluation reports, DOC reports, and a hearing. The experts' conclusions did not change upon reevaluation. The reports and testimony from each expert and witness are summarized herein.
Reports and Testimony of Dr. Myers
Dr. Myers' initial report indicated that Alston appreciated the charges against him, his sentence, and the range of possible outcomes in his postconviction proceedings. The report noted past suicide attempts, depression, and a 1995 diagnosis of bipolar disorder. Dr. Myers found that Alston's legal filings and DOC medical records were indicative of paranoia but could not determine if they were signs of actual paranoia or manipulation. As a whole, however, he stated that actual paranoia was "most consistent with his clinical presentation." He described Alston's facial expressions as inappropriate at times, his speech rate as increased and pressured, his thought content as involving "some fantasy-based thinking," and his moods as shifting "rapidly between being elevated to irritable." But he also noted that Alston was oriented to person, place, and date, had a good attention span, possessed a quick and efficient memory, and performed in the average range of intellectual functioning. He found that Alston's legal filings indicated a "coherent and organized thought process" but that his interview presented "mood variations and episodic bouts of a circumstantial, vague thought process ... consistent with Bipolar Disorder, Hypomanic Episode." And he reached the opinion that, because of Alston's "disturbed thought process" and "mood disturbance," it would be difficult for Alston to consult with his attorney with a reasonable degree of rational understanding or to testify relevantly.
In his 2002 reevaluation report, Dr. Myers found Alston's speech normal in volume and tone but increased in rate, tangential, and rambling at times. He indicated that Alston expressed delusional ideas but denied hallucinations or suicidal ideation. As before, Dr. Myers found Alston within the average range of general intelligence and oriented to time, person, and place. He concluded that Alston continued to show evidence of bipolar disorder and hypomanic episode with psychotic features and that, although Alston appreciated the nature of the legal process and competency determination to be made, he would have difficulty consulting with his attorney due to his "mild grandiose and paranoid delusional thinking and illogical, shallow thought process." Dr. Myers also acknowledged indications of intentional embellishment by Alston but concluded that Alston's delusional thinking appeared genuine given his consistency of symptoms over numerous years and the cyclical nature of bipolar disorder.
At the March 20, 2003, competency hearing, Dr. Myers testified that he had witnessed four hours of consistent behavior by Alston that included irritability, low frustration-tolerance, an increased volume of speech, pressured speech, inflated sense of self-worth, inappropriate facial expressions, hyper-religiosity, a theme of paranoia, and a superficiality of thought process. Dr. Myers noted some elements of malingering but stated that malingering was not the primary explanation for Alston's symptoms. He found that Alston exhibited symptoms of both a hypomanic episode and embellishment and that the ambivalence shown by Alston's multiple legal filings juxtaposed with statements expressing a desire to die reflect Alston's irritability and depression. Dr. Myers explained that Alston's ability to stay calm in the courtroom is inconsistent with full-blown mania but not with a hypomanic *51 episode and that his concerns regarding Alston's competency stem from Alston's thought process disorder that results in rambling speech with superficial content.
Reports and Testimony of Dr. Berland
Dr. Berland administered MMPI-2 testing of Alston, which he found indicated no attempt by Alston to fake or exaggerate symptoms of mental illness and reflected symptoms of psychotic disturbance, mood disturbance, and possibly antisocial thinking patterns. In his initial report, Dr. Berland noted that it was indicative of a genuine symptom report that Alston admitted certain symptoms and denied others. During their meeting, Alston exhibited paranoia and admitted to auditory and visual hallucinations. Dr. Berland also found that DOC records filed by Alston contained "loosened associations" and an "illogical flow of words and ideas." He indicated the finding of elements of delusional thinking seen in genuinely disturbed people that would be less likely utilized by malingerers and ultimately found the presence of a genuine psychotic disturbance that would prevent Alston from consulting with his attorney with a reasonable degree of rational understanding.
Upon reexamination, Dr. Berland again administered MMPI-2 testing and concluded that the results indicated the presence of a chronic psychotic disturbance, specifically delusional paranoid beliefs, hallucinations, and biologically determined mood disturbance. Dr. Berland found no evidence of malingering or exaggeration of symptoms, and concluded that indications of antisocial thinking were in part the result of a manic disturbance. Dr. Berland indicated that Alston's answers to questions would initially be relevant and devolve into delusional rambling and that Alston exhibited a factual appreciation of the nature of the proceedings against him but expressed irrational beliefs about them as well.
At the March 20, 2003, competency hearing, Dr. Berland testified that his diagnosis of chronic psychotic disturbance was based on consistent, delusional thinking exhibited in Alston's legal filings, more than seven hours of personal contact, and the DOC reports. Dr. Berland described his own significant experience with malingerers within a unit of the Florida State Hospital that specialized in the detection of malingering. He found indications of psychotic thinking, both in Alston's presentation and test results, and testified that objective indicators from MMPI-2 testing showed that Alston was open about his symptoms and trying "in a very primitive and psychotic way to hide his mental illness." Dr. Berland stated that the testing also indicated symptoms of paranoid thinking and mania and that Alston's illness is in the "chronic range," meaning he has had psychosis for at least two years and thus is not distressed by it but rather is familiar with and tries to hide it. He added that DSM-IV indicates prolific and voluminous writing as a symptom of manic disturbance. Dr. Berland noted that malingering would be inconsistent with Alston's stated desire to move forward with the death penalty, and stated that psychosis and an ability to manipulate are not mutually exclusive. He concluded that Alston's psychosis, in the form of both mood and perceptual disturbance, can only be treated by medication.
Reports and Testimony of Dr. Mhatre
Dr. Mhatre's initial report indicated that Alston repeatedly expressed that he wished to be executed or freed, but not left imprisoned. Dr. Mhatre's conclusions were as follows:
[Alston], in my medical opinion, is not clinically depressed at this present time. The despair and despondency he is experiencing *52 at this present time is consistent with a person whose freedom has been taken away and is on death row. His decisions appear to be logical, well thought out, and with a purpose. It is therefore, my medical opinion, he should be considered competent to proceed in a post conviction phase.
Dr. Mhatre also indicated the following impression: adjustment reaction with mild depression and antisocial personality disorder. He advised that Alston's "psychiatric problems are not severe enough to require psychiatric intervention."
In his reevaluation report, Dr. Mhatre noted that DOC records indicated Alston had refused to take medications and that physicians and counselors felt he did not show signs of psychopathology but rather of adjustment reaction with mixed emotional features and antisocial personality disorder. Dr. Mhatre reported that Alston admitted his guilt of the crime for which he was convicted but urged that Assistant State Attorney Angela Corey wanted him on death row because he had information implicating the police department regarding another murder. Regarding Alston's reports of frustration, mild depression, and a desire to receive his death sentence, Dr. Mhatre found Alston slightly depressed. Regarding grandiose statements by Alston, such as that he had found a cure for AIDS and breast cancer, Dr. Mhatre concluded that Alston was malingering. He also found no evidence of bipolar affective disorder or hallucinations. Dr. Mhatre acknowledged symptoms of paranoia and delusion, but noted that Alston's changing clinical presentation from an earlier bipolar affective disorder diagnosis to the different clinical presentation of paranoia and delusion was a sign of malingering. He diagnosed Alston as suffering from antisocial personality disorder and a mild degree of depression. Ultimately, Dr. Mhatre concluded that Alston's symptoms did not rise to the level of affecting his competency, finding him capable of assisting in his own defense, exhibiting appropriate courtroom behavior, and challenging State witnesses.
At the March 20, 2003, competency hearing, Dr. Mhatre described Alston as "in full control of his emotions, his thinking was pretty rational, very coherent." He testified that although Alston exhibited delusions of grandeur, a symptom of bipolar disorder, he did not exhibit other symptoms, such as elated mood, flight of ideas, pressured speech, or physical hyperactivity. He acknowledged that a person with bipolar disorder may be diagnosed differently at different times but stated that it is highly unusual for only half the symptoms to be exhibited at a single time. Dr. Mhatre emphasized Alston's "very high level of functioning" and that Alston had a "very rational conversation about different legal issues" with his attorney in Dr. Mhatre's presence. He noted that Alston appeared to convey different delusions to different people and tended to exhibit a smirking facial expression when conveying delusions. In the absence of other symptoms, Dr. Mhatre concluded that Alston's delusions were malingering. He diagnosed Alston with antisocial personality disorder and noted that malingering is a "big part" of that diagnosis.
Reports and Testimony of DOC Staff
The regular DOC reports ordered by and filed with the circuit court indicated the following. Dr. Gloria Calderon, a staff psychiatrist at UCI, conducted a psychological evaluation of Alston in November 2001, found no evidence of psychotic psychopathology, and diagnosed him with adjustment disorder with mixed feature and antisocial personality disorder. Dr. J. McKinsey conducted a second psychological evaluation of Alston in January 2002, *53 found no evidence of major thought or affective disorder, and agreed with Dr. Calderon's diagnosis. Monthly appointments with DOC psychological specialist Lisa Wiley, M.A., were scheduled. Alston refused to attend a number of these appointments, but Wiley was able to observe him briefly on a few of those occasions, when she attempted to gain his participation. Specifically, Alston refused to attend the December 2001 appointment; attended the January 2002 appointment and complained of illegalities by the court; refused to attend the February 2002 appointment but participated that same month in a counseling session, in which he exhibited rational thinking with a tendency to digress; refused to attend the March 2002 appointment and exhibited rambling speech pattern; attended the April and May 2002 appointments, at which he denied mental health concerns and exhibited rambling conversation with loosely organized thought pattern; refused to attend the June and July 2002 appointments; attended the August 2002 appointment and made suspicious allegations; was interviewed by Dr. Calderon in August 2002 and was found to exhibit euthymic mood, appropriate affect, rational thinking, a tendency to ramble, and no delusional material or loosening of associations; attended the September 2002 appointment, at which he exhibited a tendency to ramble and expressed a desire to be found competent; attended the October 2002 appointment, at which he reported mood problems but exhibited an inconsistent affect; attended the November 2002 appointment, at which he exhibited rambling, euthymic mood, and an inconsistent affect; and refused to attend all appointments from December 2002 through March 2003. In those final four months, the reports indicated that Alston exhibited sadness and a restricted range of affect and emotions, appeared subdued, but maintained rational conversation.
At the March 20, 2003, competency hearing, Wiley testified that she observed death row inmates as a group once each week and, over the prior couple of years, had interviewed Alston once a month for thirty to forty-five minutes except on those occasions when he refused to attend. Wiley testified that Alston was classified as "psychiatric grade two" under the care of her psychology department, as opposed to grade three, which would place him under the care of a psychiatrist and regular observation. He was placed in grade two after Dr. McKinsey and Dr. Calderon diagnosed him with adjustment disorder. Wiley stated that the UCI staff were familiar with Alston's discussion of secret agents and coded colors, but that they had not observed the types of behavior usually referred to the psychology department, such as non-eating, sleep problems, or intentional self-harm. In speaking with Alston, Wiley found his delusional speech could be redirected to rational conversation, and she testified that she had never seen someone with bipolar disorder or psychotic symptoms able "to turn on and off" his symptoms in that way.
Dr. Calderon also testified at the hearing. Dr. Calderon stated that she had seen Alston three or four times in 2000, once in 2001, and conducted an evaluation of him in August 2002. She testified that she was aware of Dr. Myers' earlier report and findings when she conducted the 2002 evaluation but found no symptoms of bipolar disorder. Dr. Calderon diagnosed Alston with adjustment disorder with mixed disturbance of emotion and conduct, but found no evidence of psychotic disorder, hallucinations, or delusional thinking.
In addition to Wiley and Dr. Calderon, Sergeant Michael Young, the administrative sergeant at UCI who oversees the day-to-day basic operation of death row, testified at the competency hearing. Sergeant *54 Young has daily contact with Alston, who had been on disciplinary confinement for close to two years as of the date of the competency hearing. Sergeant Young expressed his impression that Alston preferred disciplinary confinement to mingling with the general population of death row and that Alston would purposely violate rules whenever his removal from disciplinary confinement drew near. He noted that Alston had received numerous disciplinary reports, mostly for disobeying verbal orders or violating mailing restrictions. He stated that Alston mailed three to four items to governmental officials per day and involved the staff frequently. Sergeant Young stated that Alston took on a "different demeanor" when removed to interview rooms for mental assessments or legal calls, but that the "theatrics are gone" when Alston returned to his cell. He stated that Alston was "rational, coherent, calm" in his cell and could "turn [his strange behavior] off at a whim." He further indicated that he had only seen Alston's delusional behavior "when he is out of cell and he's got a forum or audience."

ANALYSIS OF COMPETENCY DETERMINATION
The criteria for determining competence to proceed is whether the prisoner "has sufficient present ability to consult with counsel with a reasonable degree of rational understanding  and whether he has a rational as well as a factual understanding of the pending collateral proceedings." Hardy v. State, 716 So.2d 761, 763 (Fla.1998) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)); see also § 916.12(1), Fla. Stat. (2003); Fla. R.Crim. P. 3.211(a)(1), 3.851(8)(A).
"It is the duty of the trial court to determine what weight should be given to conflicting testimony." Mason v. State, 597 So.2d 776, 779 (Fla.1992). "The reports of experts are `merely advisory to the [trial court], which itself retains the responsibility of the decision.'" Hunter v. State, 660 So.2d 244, 247 (Fla.1995) (quoting Muhammad v. State, 494 So.2d 969, 973 (Fla.1986)). Thus, when the experts' reports or testimony conflict regarding competency to proceed, it is the trial court's responsibility to consider all the relevant evidence and resolve such factual disputes. See, e.g., Hardy, 716 So.2d at 764 (citing Hunter, 660 So.2d at 247).
"Where there is sufficient evidence to support the conclusion of the lower court, [this Court] may not substitute [its] judgment for that of the trial judge." Mason, 597 So.2d at 779. A trial court's decision regarding competency will stand absent a showing of abuse of discretion. See, e.g., Hardy, 716 So.2d at 764; Carter v. State, 576 So.2d 1291, 1292 (Fla.1989). Thus, the issue to be addressed by this Court is whether the circuit court abused its discretion in finding Alston competent to proceed in his postconviction proceedings. In addressing that issue, we are mindful that a trial court's decision does not constitute an abuse of discretion "unless no reasonable person would take the view adopted by the trial court." Scott v. State, 717 So.2d 908, 911 (Fla.1998).
In determining Alston's competence to proceed, the circuit court addressed the issue and held as follows:
By stipulation of the parties, the reports of the examining experts were admitted into evidence in order to expedite the oral testimony of the witnesses. In addition, the periodic reports from the Department of Corrections were admitted into evidence. Dr. Umesh Mhatre, a psychiatrist, found that Pressley Alston is competent to proceed and attributes his idiosyncracies to malingering. Dr. Wade Myers, also a psychiatrist, believes *55 that the defendant is not competent to proceed as he suffers from a "mild" form of mental illness. Dr. Robert Berland, a clinical psychologist, had the opinion that the defendant suffers from "severe" mental illness.
Lisa Wiley, a psychological specialist with the Department of Corrections who submitted the periodic reports to the court, had an opportunity to observe Pressley Alston regularly as she is the Department of Corrections employee who renders psychological services to all death-row inmates housed at Union Correctional Institution. She observed no behavior on his part which suggested mental illness. Dr. Calderon is a staff psychiatrist with Department of Corrections who works at Union Correctional and she also found no evidence of mental illness. Also testifying was Sergeant Mike Young who is the supervising Department of Corrections employee assigned to death row at Union Correctional Institution. He sees the defendant five days a week and knows him well. His observations lead him to conclude that Alston is a manipulative inmate who is malingering.
Over objection of his lawyer, Pressley Alston made a statement to the court. He requested that the court find him competent to proceed. He further requested that the court schedule a hearing wherein he can waive his right to counsel, waive his right to collateral proceedings and request that the sentence of the court be carried out. In fact, he wanted a hearing on that matter right then but the court declined, explaining to Pressley Alston that the court preferred to enter an order on his competency and then proceed in an orderly fashion on his request.
The court is confident in its conclusion that Pressley Alston is competent to proceed. He has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and he has a rational as well as a factual understanding of the pending collateral proceedings.
State v. Alston, No. 95-0053260-CF-A, order at 1-2 (Fla. 4th Cir. Ct. order filed March 27, 2003).
We find that evidence in the form of Dr. Mhatre's reports and testimony, the DOC reports, and the testimony by DOC personnel support the circuit court's conclusion that Alston is competent to proceed. Dr. Mhatre diagnosed Alston as suffering from antisocial personality disorder and mild depression, but rejected the conclusion that Alston also suffered from bipolar disorder. He concluded that Alston's symptoms of delusion were "clear malingering" and found none of the additional symptoms of bipolar disorder. Emphasizing Alston's "very high level of functioning," Dr. Mhatre concluded that Alston is capable of assisting in his own defense, exhibiting appropriate courtroom behavior, and challenging State witnesses. The DOC reports indicated that UCI staff psychologists Dr. Calderon and Dr. McKinsey evaluated Alston on two different occasions, found no evidence of psychotic psycho-pathology, and diagnosed him with an adjustment disorder with mixed feature and antisocial personality disorder. The DOC reports further indicated that although Alston exhibited a rambling speech pattern on a number of occasions, he also exhibited rational thinking and conversation. Wiley testified that Alston's delusional speech could be redirected to rational conversation and that Alston appeared capable of turning his symptoms "on and off." Finally, Sergeant Young testified that Alston appeared to purposely violate rules to ensure that he remained in disciplinary confinement, that Alston took on a "different demeanor" for mental assessments *56 and legal calls, and that Alston was "rational, coherent, [and] calm" in his cell but exhibited delusional behavior when he was out of his cell and had "a forum or audience."
Although Dr. Myers concluded that Alston was incompetent to proceed, he also acknowledged that Alston's legal filings indicated a "coherent and organized thought process," that Alston appreciated the nature of the legal process, and that Alston exhibited some elements of malingering. Dr. Myers' diagnosis was that Alston suffered from "mild" grandiose and paranoid delusional thinking and that his symptoms were consistent with a "hypomanic episode," which was less severe than a manic episode. Only Dr. Berland found no evidence of malingering. However, he also found that Alston exhibited a factual, if not rational, appreciation of the nature of the proceedings.
Given the evidence at hand and the applicable standard of review, we conclude that a sufficient basis exists to support the circuit court's resolution of the conflicting evidence and that the circuit court did not abuse its discretion in finding Alston competent to proceed. Cf. Hertz v. State, 803 So.2d 629, 640-41 (Fla.2001) (affirming circuit court finding of competency where defense experts found defendant incompetent, but other experts found defendant competent, capable of understanding charges against him and roles and functions of courtroom personnel, did not exhibit major mental illness, and presented behavior that could be evidence of malingering); Ferguson v. State, 789 So.2d 306, 315 (Fla.2001) (affirming circuit court finding of competency where circuit court's rejection of defense experts' opinions supported by testimony of three doctors who found evidence of malingering, by testimony of corrections officers that defendant only acted irrationally shortly before and after mental evaluations, and by neurological examinations revealing no organic brain disease); Bryant v. State, 785 So.2d 422, 427 (Fla.2001) (affirming circuit court finding of competency where two of three experts concluded defendant was competent and two supervising deputy sheriffs observed defendant providing legal advice to others and saw nothing indicating defendant suffered mental defect or infirmity); Hardy, 716 So.2d at 764 (affirming circuit court finding of competency where supported by testimony of three out of five experts, testimony from jail employees regarding prisoner's abilities to communicate and participate in activities, and circuit court's own observations of demeanor and ability to assist counsel).

INQUIRY AT DUROCHER HEARING
At the June 6, 2003, Durocher hearing, the circuit court informed Alston that his three options were to allow his CCRC-M counsel to proceed in his postconviction proceedings, to discharge his CCRC-M counsel and proceed pro se, or to both discharge his CCRC-M counsel and waive his right to postconviction relief. Alston indicated that he chose the third option and stated that he understood that the result of waiving his rights to postconviction counsel and relief would be reviewed by this Court, followed by receipt of his case by the Governor for the signing of a death warrant. The circuit court conducted a Faretta[3] inquiry and allowed counsel to inquire of Alston. Alston indicated that he understood that waiver of his right to postconviction relief would bar the filing of further pro se petitions. Although he expressed frustration at the lack of progress in his postconviction proceedings and indicated that he believed time limitations prevented *57 him from going forward with them, he was informed during the hearing that time limitations very likely would not prevent him from going forward, with or without counsel, now that he had been found competent. Alston nonetheless insisted that he did not wish to proceed. Later in the hearing, Alston stated that undercover agents tracked him and his mail while he was in prison and that that activity related to the murder of a police detective. Alston suggested the delay in his own case was a result of that "criminal investigation." CCRC-M counsel then expressed continued concern regarding Alston's competency. The circuit court indicated gratitude for the continued advocacy by CCRC-M counsel but found Alston had knowingly, intelligently, and voluntarily waived his rights to postconviction counsel and relief.

ANALYSIS OF VALIDITY OF WAIVER
An abuse of discretion standard applies when reviewing a trial court's determination regarding a capital defendant's competency to waive postconviction counsel and proceedings. Slawson v. State, 796 So.2d 491, 502 (Fla.2001); Castro v. State, 744 So.2d 986, 989 (Fla.1999). Thus, the issue to be addressed here is whether the circuit court abused its discretion in finding that Alston knowingly, intelligently, and voluntarily waived his rights to postconviction counsel and proceedings.
In Durocher v. Singletary, 623 So.2d 482 (Fla.1993), a case in which a capital defendant wished to drop all postconviction proceedings and waive representation by CCRC, this Court stated that "[c]ompetent defendants have the constitutional right to refuse professional counsel and to represent themselves, or not, if they so choose." Id. at 483 (citing Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). Further, this Court wrote:
Regardless of our feelings about what we might do in a similar situation, we cannot deny Durocher his right to control his destiny to whatever extent remains....
Having said this, however, we also recognize that the state has an obligation to assure that the waiver of collateral counsel is knowing, intelligent, and voluntary. Accordingly, we direct the trial judge forthwith to conduct a Faretta-type evaluation of Durocher to determine if he understands the consequences of waiving collateral counsel and proceedings.... If the Faretta-type hearing raises questions in the judge's mind about Durocher's competency, he may order a mental health evaluation and make a competency determination thereafter.
Id. at 484-85 (emphasis added). Later, in Slawson, 796 So.2d at 502, this Court stated that Durocher"established that the relevant test for competency in the context of waiving collateral counsel and collateral proceedings in Florida is whether the person seeking waiver has the capacity to `understand[] the consequences of waiving collateral counsel and proceedings.'" Additionally, in Johnston v. State, 497 So.2d 863, 868 (Fla.1986), this Court stated that in determining whether a defendant has knowingly and intelligently waived his right to counsel, a trial court should inquire into, among other things, the defendant's age, mental status, and lack of knowledge and experience in criminal proceedings.
In its order discharging Alston's CCRC-M counsel and dismissing Alston's postconviction proceedings, the circuit court stated:
Pressley Alston was before the court on June 6, 2003, on his request to discharge Capital Collateral Regional Counsel (CCR) and his request to waive *58 post-conviction relief. Two CCR lawyers were present representing the defendant and two lawyers were present on behalf of the State of Florida. The court placed the defendant under oath and thereafter the court inquired as to his wishes. Mr. Alston made it clear that he wanted to discharge counsel and waive post-conviction or collateral relief.
After the court's interrogation the lawyers for the parties inquired of the defendant to be sure that his decision was free, voluntary and knowing. Although the defendant has a tendency to ramble somewhat at times, his responses to the court's and counsel's questions were coherent and logical. His decision was knowing, intelligent and voluntary.
State v. Alston, No. 95-0053260-CF-A, order at 1 (Fla. 4th Cir. Ct. order filed June 12, 2003).
The transcript of the Durocher hearing reflects that the circuit court conducted a Faretta-type evaluation of Alston, eliciting information that Alston was thirty-two years old at the time of the hearing, had completed high school, reads and writes in the English language, was not under any medication, and understood the purpose of the hearing. Additionally, the transcript reflects that Alston repeatedly exhibited an understanding of the consequences of waiving his rights to postconviction counsel and proceedings. On the basis of this record, we conclude that the circuit court, having held a hearing at which the judge explored Alston's age, education, and capacity to understand the consequences of waiver, has complied with the standards applicable to waiver of one's rights to collateral counsel and proceedings, and therefore did not abuse its discretion.
In court-ordered briefs to this Court, CCRC-M counsel primarily argue that Alston's tendency to ramble at the Durocher hearing calls into question his competency to waive his rights and that Alston's additional pro se filings following the Durocher hearing contradict the conclusion that Alston's decision was knowing, intelligent, and voluntary. However, as this Court's case law indicates, this argument is insufficient to establish that the circuit court abused its discretion.
In Sanchez-Velasco v. State, 702 So.2d 224 (Fla.1997), the circuit court held a Durocher hearing at which Sanchez-Velasco indicated that he understood the nature of postconviction motions, that by withdrawing his motion he would lose forever his right to any further appeals, and that after he elected to represent himself, the court would not appoint another attorney for him. On appeal to this Court, his prior counsel asserted that Sanchez-Velasco's competency was placed in legitimate doubt by his simultaneous and contradictory demands that his counsel be dismissed due to ineffectiveness in pressing his postconviction claims and that he be allowed to withdraw his postconviction motions. Noting that the circuit court followed the procedure outlined in Durocher, repeatedly stressed the implications of dismissing his collateral appeal, and had support in the record for finding Sanchez-Velasco to be competent, this Court affirmed the order discharging postconviction counsel and dismissing postconviction proceedings. 702 So.2d at 228. We specifically found that, "to the extent such a contradiction may exist, it does not in and of itself lead us to doubt Sanchez-Velasco's competence in the face of at least ten evaluations determining him to be competent." Id.
Additionally, in Slawson, 796 So.2d at 491, the circuit court followed the procedures outlined in Durocher, considered the reports, testimony, and conclusions of three doctors regarding Slawson's competency, and found Slawson competent to make a knowing, intelligent, and voluntary *59 waiver of his rights to collateral counsel and proceedings. This Court then affirmed, writing:
The circuit court has extensively questioned Slawson regarding his knowledge of his pending proceedings, the rights he would be waiving, and the consequences of making such a waiver. Slawson's responses to the questions posed by the circuit court demonstrate that he comprehends his legal options and the consequences of a waiver. Although it is clear that Slawson is disenchanted with the perceived inadequacy of the representation being provided to him by CCRC-M, that fact alone does not negate his ability to waive both collateral counsel and collateral proceedings.
Id. at 502-03.
Finally, in Castro, 744 So.2d at 986, Castro's discharged counsel relied on the existence of conflicting testimony regarding Castro's competency to attack the circuit court's determination that Castro was aware of the rights he was waiving and the order discharging CCRC and dismissing Castro's postconviction motion. This Court first considered all of the testimony regarding competency and concluded that there was no showing of an abuse of discretion with regard to the circuit court's competency determination. Id. at 989. This Court then concluded that the circuit court had likewise complied with the requirements of Durocher and affirmed the circuit court's order. Id. at 990.

CONCLUSION
Based upon the record below and applicable standards of review, we conclude that the circuit court did not abuse its discretion in finding Alston competent to proceed in his postconviction proceedings or in finding Alston knowingly, intelligently, and voluntarily waived his rights to postconviction counsel and proceedings. Accordingly, we affirm the circuit court's orders finding competency, discharging CCRC-M, and dismissing with prejudice all motions or petitions for postconviction relief.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO and BELL, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] The vast majority of these filings alleged that the prosecutor in Alston's case prosecuted him in order to cover up a crime committed by a law enforcement officer and that Alston's prison guards are part of the conspiracy.
[2] Durocher v. Singletary, 623 So.2d 482 (Fla.1993).
[3] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).