[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 8, 2010
JOHN LEY
CLERK

No. 09-15137

D. C. Docket No. 04-00257-CV-TJC

PRESSLEY ALSTON,

Petitioner-Appellant,

versus

DEPARTMENT OF CORRECTIONS, STATE OF FLORIDA,
FLORIDA ATTORNEY GENERAL'S OFFICE,

Respondents-Appellees.

Appeal from the United States District Court
for the Middle District of Florida

**(July 8, 2010)**

Before DUBINA, Chief Judge, BIRCH and BARKETT, Circuit Judges.

DUBINA, Chief Judge:

Petitioner Pressley Bernard Alston, a Florida death row inmate, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. The state court decided that Alston was competent to waive his state post-conviction proceedings and that his waiver was knowing, intelligent, and voluntary. The district court found the state court's decision a reasonable application of clearly established federal law and a reasonable determination of the facts in light of the evidence presented in the state court proceedings. After reading the parties' briefs, hearing oral argument, and reviewing the record, we affirm the district court's order denying Alston federal habeas relief.

## I. BACKGROUND

A. *Facts*

The facts are taken verbatim from the Florida Supreme Court's decision on direct appeal from Alston's convictions and sentences.

> The victim in this case, James Lee Coon, was last seen January 22, 1995, while visiting his grandmother at the University Medical Center in Jacksonville. Coon's red Honda Civic was discovered the next day abandoned behind a convenience store. A missing persons report was filed shortly thereafter.
>
> At trial, Gwenetta Faye McIntyre testified that on January 19, 1995, appellant was living at her home when they had a disagreement and she left town. On January 23, 1995, the day after Coon's disappearance, McIntyre returned to Jacksonville. On that day, McIntyre and three of her children were in her gray Monte Carlo

2

parked at a convenience store when appellant and Dee Ellison, appellant's half-brother, drove up in a red Honda Civic. They parked the Honda perpendicular to the Monte Carlo, blocking McIntyre's exit. Appellant got out of the Honda and approached McIntyre, who reacted by driving her car forward and backward into the store and into the Honda. Appellant took McIntyre's keys from the ignition. He then went back to the Honda and drove it around to the back of the convenience store, where he abandoned it. Appellant and Ellison then got into the Monte Carlo, and everyone left the scene together. At that time, McIntyre asked appellant about the Honda. He replied that it was stolen. McIntyre also noticed that appellant was carrying her .32 caliber revolver, which she kept at her home.

Despite their previous differences and the incident at the convenience store, appellant continued to live with McIntyre. Soon thereafter, McIntyre began seeing news broadcasts and reading news reports about Coon's disappearance and the fact that Coon drove a red Honda Civic, which was found abandoned behind a convenience store. McIntyre became suspicious of appellant. When she confronted him with her suspicions, he suggested that someone was trying to set him up. McIntyre was also concerned because the news stories contained eyewitness accounts of the red Honda being rammed by a gray Monte Carlo in the parking lot of the same convenience store behind which the Honda was found. Appellant suggested painting the Monte Carlo a different color, which appellant did on or about February 19, 1995.

McIntyre testified that she became more suspicious when appellant asked her how long it would take for a body to decompose and how long it would take for a fingerprint to evaporate from a bullet. McIntyre confided her suspicions in her minister, who eventually put her in touch with the Jacksonville Sheriff's Office. On May 25, 1995, McIntyre went to the sheriff's office to talk with several detectives, including Detectives Baxter and Roberts. After the interview with McIntyre, police secured McIntyre's consent to search her home. Police retrieved, among other things, McIntyre's .32 caliber revolver from her home.

Based on the information that McIntyre gave to detectives and the evidence gathered from her home, police arrested Ellison and later on the same day arrested appellant. At the police station, appellant was read his rights, and he signed a constitutional rights waiver form. After detectives told appellant that they knew about the incident at the convenience store, that they had the murder weapon, and that they had Ellison in custody, appellant confessed, both orally and in writing, to his involvement in the crime.

In his written confession, appellant stated that during the week preceding Coon's disappearance, appellant had been depressed due to employment and relationship problems. He and Ellison planned to commit a robbery on Saturday, January 21, 1995, but they did not find anyone to rob. On Sunday, January 22, 1995, they saw Coon leave the hospital in his red Honda Civic. Appellant stated that he and Ellison made eye contact with Coon, and Coon "pulled up to them." Appellant and Ellison got into Coon's car. Ellison rode in the front seat and appellant in the back. After Coon drove a short distance, Ellison pointed a revolver at Coon and took Coon's watch. Appellant told Coon to continue driving. They rode out to Heckscher Drive and stopped. Ellison then took Coon's wallet, and he and appellant split the cash found inside, which totaled between $80 and $100. As appellant searched Coon's car, some people came up, so appellant, Dee, and Coon drove away. They drove to another location, where appellant and Ellison shot Coon to death.

Following the confession, appellant agreed to show detectives the location of Coon's body. Appellant directed Detectives Baxter, Roberts, and Hinson, along with uniformed police, to a remote, densely wooded location on Cedar Point Road. Detective Baxter testified that a continuous drive from the University Medical Center to where Coon's body was found, a distance of approximately twenty miles, takes twenty-five to thirty minutes. During the ensuing search, Detective Hinson asked appellant what happened when appellant took Coon into the woods. Appellant replied, "We had robbed somebody and taken him in [the] woods and I shot him twice in the head." Because of the darkness and the thickness of the brush, police were

4

unable to find Coon's body, and they terminated the search for the remainder of that evening.

On the way back to the police station, at appellant's request, he was taken to his mother's house. When Detective Baxter mentioned that appellant was arrested regarding the Coon investigation, appellant's mother asked appellant, "Did you kill him?" Appellant replied, "Yeah, momma." The detectives then took appellant back to the police station. By then, it was 3:30 on the morning of May 26, 1995. At that time, the detectives had to walk appellant to the jail, which is across the street from the police station. A police information officer alerted the media that a suspect in the Coon murder was about to be "walked over" to the jail. During the "walk-over," which was recorded on videotape by a television news reporter, appellant made several inculpatory remarks in response to questions from reporters.

Later during the morning of May 26, 1995, Detectives Baxter and Hinson, with uniformed officers, took appellant back to the wooded area and resumed their search for Coon's body. At this time, appellant was again advised of his constitutional rights. Appellant waived his rights and directed the detectives to the area that was searched the previous day. The body was discovered within approximately ten minutes of the group's return to the area.

The remains of Coon were skeletal. The skull was apparently moved from the rest of the skeleton by animals. Three bullets were recovered from the scene. One was found in the victim's skull. One was in the dirt where the skull would have been had it not been moved. Another was inside the victim's shirt near his pocket. Using dental records, a medical expert positively identified the remains as those of James Coon. The expert also testified that the cause of death was three gunshot wounds, two to the head and one to the torso. The expert stated that he deduced there was a wound to the torso from the bullet hole in the shirt. He explained that the absence of any flesh or soft tissue made it impossible to prove that the bullet found inside the

5

shirt had penetrated the torso. The expert further testified that Coon was likely lying on the ground when shot in the head.

A firearm expert testified that the bullets recovered at the scene were .32 caliber, which was the same caliber as the weapon retrieved from McIntyre's home. This expert further testified that, in his opinion, there was a ninety-nine percent probability that the bullet found in the victim's skull came from McIntyre's revolver. However, because the bullet found in the dirt and the bullet found inside Coon's shirt had been exposed for such a long period, a positive link between those two bullets and McIntyre's revolver was impossible.

Later during the day that Coon's body was found, appellant contacted Detective Baxter from the jail and asked the detective to meet with him. Appellant did not make a written statement at this meeting. According to Detective Baxter's testimony, appellant stated that he did not kill Coon but that Ellison and someone named Kurt killed Coon. Appellant stated that he initially placed the blame on himself because he wanted to be "the good guy." Detective Baxter told appellant that he did not believe him and began to leave. Appellant asked Detective Baxter to stay and told him that he lied about Kurt because he heard that Ellison was placing the blame on him. Appellant then stated that he shot Coon twice in the head and that Ellison shot him once in the body.

On June 1, 1995, appellant requested that Detectives Baxter and Roberts come to the jail. The detectives took appellant to the homicide interrogation room. Appellant was advised of his rights. Appellant then signed a constitutional rights form and gave a second written statement. In this statement, appellant stated that Ellison and Kurt initially kidnapped Coon during a robbery. Ellison sought out appellant to ask him what to do with Coon, who had been placed in the trunk of his own car. Appellant stated that when he opened the trunk, Coon was crying and he begged, "Oh, Jesus, Oh Jesus, don't let anything happen, I want to finish college."

Appellant said he told Ellison that "the boy will have to be dealt with, meaning kill[ed]," because he could identify them. Kurt left and never came back. Thereafter, appellant and Ellison drove to Cedar Point Road. Once all three were out of the car, appellant gave Ellison the gun and told him, "You know what's got to be done." Ellison took the weapon, walked Coon into the woods, and shot Coon once. Appellant stated that he then walked into the brush and, wanting to ensure death, shot Coon, who was lying face down on the ground. Appellant stated that Ellison also fired another round.

Police eventually located the person appellant had called Kurt. After interrogating Kurt, police concluded he was not involved in Coon's murder.

*Alston v. State*, 723 So. 2d 148, 150–53 (Fla. 1998) (alterations in original) (footnotes omitted).

B. *Procedural History*

A Duval County, Florida, jury convicted Alston of first-degree murder, armed robbery, and armed kidnapping. At the penalty phase, the jury recommended a death sentence by a vote of nine to three. The trial court found the following aggravating factors: (1) the defendant was convicted of three prior violent felonies; (2) the murder was committed during a robbery/kidnapping and for pecuniary gain; (3) the murder was committed for the purpose of avoiding a lawful arrest; (4) the murder was especially heinous, atrocious, or cruel; and (5) the murder was cold, calculated, and premeditated. *See* Fla. Stat. § 921.141(5)(b), (d), (e), (f), (h), (i) (1995). The trial court did not find any statutory mitigating

7

factors, but did consider several non-statutory mitigating factors, such as the fact that Alston had a horribly deprived and violent childhood, that he is of low intelligence and mental age, that he cooperated with law enforcement, that he has a bipolar disorder, and that he has the ability to get along with people. The trial court then imposed consecutive life sentences on the armed robbery and armed kidnapping counts and, after weighing the relevant factors, concurred with the jury's recommendation of a death sentence for the murder conviction.

Alston appealed his convictions and sentences, and the Supreme Court of Florida affirmed. *Alston v. State*, 723 So. 2d 148 (Fla. 1998). In late 1999, Capital Collateral Regional Counsel ("CCRC"), as appointed counsel for Alston, filed a "shell" motion to vacate his judgment of conviction and sentence in the state circuit court. *See* Fla. R. Crim. P. 3.850 (2006). Prior to this filing, Alston sent a letter to the circuit court expressing a desire to represent himself. CCRC filed motions to withdraw, alleging that Alston refused to work with them on his case. The circuit court denied the motions. In May 2000, the circuit court conducted a hearing regarding Alston's request to represent himself and thereafter directed CCRC to continue its representation.

In July 2000, CCRC filed a motion in the circuit court requesting a competency determination on Alston. The circuit court granted the motion and

appointed three experts, Drs. Umesh M. Mhatre, Wade Cooper Myers, and Robert

M. Berland, to examine Alston and file reports. In October 2001, after reviewing

the experts' reports, the circuit court found Alston incompetent to continue in his

collateral proceedings, ordered the Department of Corrections ("DOC") personnel

to file periodic reports with the court regarding Alston's competency, and ordered

that Alston be re-evaluated 180 days later and every thirty days thereafter. During

this time, Alston's post-conviction proceedings remained inactive.

Despite the circuit court's determination of incompetency and his CCRC

representation, Alston filed many *pro se* petitions in the Supreme Court of Florida.

Many of these motions were unclear and confusing and did not specify the relief

Alston sought. However, the Supreme Court of Florida interpreted one of the

motions to request a writ of mandamus ordering the circuit court to conduct a

*Durocher* hearing to determine if Alston understood the consequences of waiving

his collateral counsel and post-conviction proceedings. *See Durocher v.

Singletary*, 623 So. 2d 482, 485 (Fla. 1993) (stating that a trial court must conduct

a hearing pursuant to *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525 (1975),

to determine if the petitioner understands the consequences of waiving his

collateral counsel and collateral proceedings). In December 2002, the Supreme

Court of Florida ordered the circuit court to conduct a *Durocher* hearing.

9

Prior to the Supreme Court of Florida's directive to the circuit court, Drs. Mhatre, Myers, and Berland re-evaluated Alston and filed their reports with the circuit court. The DOC personnel also provided the circuit court with eight periodic reports during the court ordered re-evaluation period. After receiving these reports and the Supreme Court of Florida's order, the circuit court held a status conference on January 9, 2003, and thereafter scheduled an evidentiary hearing to determine Alston's competency to continue in his collateral proceedings. The court-appointed experts and staff from the Union Correctional Institution, where Alston was housed, testified at the March 20, 2003, evidentiary hearing. After the hearing, the circuit court issued an order finding Alston competent to proceed.

Subsequently, the circuit court held a *Durocher* hearing, at which the circuit judge, state counsel, and CCRC questioned Alston about his request to waive his rights to collateral counsel and post-conviction proceedings. The circuit court thereafter issued an order determining that Alston's decision to waive his post-conviction rights was knowing, intelligent, and voluntary. The circuit court discharged CCRC and ordered all motions or petitions for post-conviction relief dismissed with prejudice. The circuit court informed the Supreme Court of

10

Florida of its decision and provided the appellate court with a transcript of the *Durocher* hearing.

Despite the circuit court's determination and dismissal of Alston's post-conviction proceedings, Alston filed another *pro se* pleading with the Supreme Court of Florida, primarily arguing that his testimony at the *Durocher* hearing established that an assistant attorney general fabricated the case against him. The appellate court struck that pleading as an unauthorized *pro se* pleading. In response, Alston filed another *pro se* pleading, which the appellate court also struck. However, the appellate court requested the State and CCRC to file briefs regarding the circuit court's competency determination and the validity of Alston's waiver of his rights to post-conviction counsel and relief. After review, the Supreme Court of Florida affirmed the circuit court's competency determination and found that the circuit court did not abuse its discretion in finding that Alston knowingly, intelligently, and voluntarily waived his post-conviction rights. *Alston v. Florida*, 894 So. 2d 46, 55–56 (Fla. 2004).

While the Supreme Court of Florida was considering Alston's pleadings attacking the validity of the *Durocher* hearing, Alston filed a *pro se* federal habeas petition in the district court. After the appellate court issued its opinion, Alston filed an amended habeas petition, and the district court appointed counsel for

11

Alston. Counsel filed a second amended habeas petition, which the district court reviewed and denied. Alston filed a request for a certificate of appealability, which the district court granted as to one issue.

## II. ISSUE

Whether the district court erred in finding that the state court's ruling that Alston was competent to waive his post-conviction proceedings and that the waiver was knowing, intelligent, and voluntary was neither an unreasonable application of clearly established federal law nor an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## III. STANDARD OF REVIEW

"When reviewing the district court's denial of a habeas petition, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Nyland v. Moore*, 216 F.3d 1264, 1266 (11th Cir. 2000). Under the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), "our review is greatly circumscribed and is highly deferential to the state courts." *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002). We presume that state court factual findings are correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (2006). A federal court may not grant habeas relief unless the decision of the state court either was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d). The petitioner must show that the state court applied federal law to the facts of his case in an objectively unreasonable manner. *See Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 360 (2002). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S. Ct. 1495, 1522 (2000).

## IV.  DISCUSSION

On appeal, Alston challenges the district court's ruling, arguing that there is clear and convincing evidence in the record that he is incompetent and did not execute a valid waiver of his state collateral proceedings. He asserts that the state court's determination that he was competent at the time to waive his post-conviction counsel and proceedings was unreasonable, and its determination that his waiver was valid was also unreasonable because the totality of the circumstances show that he did not understand the bottom line of the waiver—that his execution would be imminently scheduled.

13

Initially, the district court found that Alston's challenge to the state court's competency ruling and its waiver validity ruling were not challenges to the legality of Alston's detention. Therefore, the district court found that the claims were not cognizable in federal habeas corpus proceedings. We agree.

Under 28 U.S.C. § 2254, a petitioner can file a federal habeas challenge to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Supreme Court has commented that "habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement." *Preiser v. Rodriguez*, 411 U.S. 475, 490, 93 S. Ct. 1827, 1836 (1973). Federal habeas relief is available to remedy defects in a defendant's conviction and sentence, but "an alleged defect in a collateral proceeding does not state a basis for habeas relief." *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004); *see also Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009) (collecting cases), *cert. denied*, 130 S. Ct. 500 (2009). There is a valid reason behind this principle: "[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment— *i.e.*, the conviction itself—and thus habeas relief is not an appropriate remedy." *Carroll*, 574 F.3d at 1365. Furthermore, such challenges often involve issues of state law, and "[a] state's interpretation of its

14

own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." *McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992).

Alston's challenge does not attack the validity of the fact or length of his confinement. His challenge concerns a state matter because Florida provides for post-conviction procedures through its state statutes. These collateral proceedings are a state created right. Thus, the state court finding that Alston was competent to waive his post-conviction proceedings concerns the state's application of its own post-conviction procedures, not the legality of Alston's detention. Accordingly, Alston's challenge to the state post-conviction proceedings does not provide a basis for federal habeas relief.

Assuming *arguendo* that the claim is cognizable in federal habeas, we conclude from the record that Alston cannot demonstrate, "by clear and convincing evidence," that the state court's competency and waiver validity findings were "not fairly supported by the record." *Ferguson v. Sec'y for the Dep't of Corrs.*, 580 F.3d 1183, 1221 (11th Cir. 2009) (internal quotation marks omitted), *cert. denied*, 78 U.S.L.W. 3590 (U.S. June 1, 2010) (No. 09-1186). There is ample support in the record for the state courts' finding that Alston was competent to waive his state post-conviction proceedings. Initially, the state

circuit court determined that Alston was competent to participate in his collateral proceedings.

By stipulation of the parties, the reports of the examining experts were admitted into evidence in order to expedite the oral testimony of the witnesses. In addition, the periodic reports from the Department of Corrections were admitted into evidence. Dr. Umesh Mhatre, a psychiatrist, found that Pressley Alston is competent to proceed and attributes his idiosyncracies to malingering. Dr. Wade Myers, also a psychiatrist, believes that the defendant is not competent to proceed as he suffers from a "mild" form of mental illness. Dr. Robert Berland, a clinical psychologist, had the opinion that the defendant suffers from "severe" mental illness.

Lisa Wiley, a psychological specialist with the Department of Corrections who submitted the periodic reports to the court, had an opportunity to observe Pressley Alston regularly as she is the Department of Corrections employee who renders psychological services to all death-row inmates housed at Union Correctional Institution. She observed no behavior on his part which suggested mental illness. Dr. Calderon is a staff psychiatrist with Department of Corrections who works at Union Correctional and she also found no evidence of mental illness. Also testifying was Sergeant Mike Young who is the supervising Department of Corrections employee assigned to death row at Union Correctional Institution. He sees the defendant five days a week and knows him well. His observations lead him to conclude that Alston is a manipulative inmate who is malingering.

Over objection of his lawyer, Pressley Alston made a statement to the court. He requested that the court find him competent to proceed. He further requested that the court schedule a hearing wherein he can waive his right to counsel, waive his right to collateral proceedings and request that the sentence of the court be carried out. In fact, he wanted a hearing on that matter right then but the court declined, explaining to Pressley Alston that the court preferred to

16

> enter an order on his competency and then proceed in an orderly fashion on his request.
>
> The court is confident in its conclusion that Pressley Alston is competent to proceed. He has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and he has a rational as well as a factual understanding of the pending collateral proceedings.

*Alston*, 894 So. 2d at 54–55; [R. Resp't Ex. 23.].

The state circuit court then conducted a *Durocher* hearing and considered whether Alston knowingly, intelligently, and voluntarily waived his post-conviction counsel and collateral proceedings. Alston stated at the hearing that he knew that if he did not pursue collateral proceedings, the governor would sign a death warrant. Alston commented that he wanted the court's sentence and judgment carried out by law. The circuit court found that Alston indicated that he understood that the waiver of his right to post-conviction relief would bar the filing of further *pro se* petitions. Accordingly, the circuit court concluded that Alston's waiver was knowing, intelligent, and voluntary. [R. Resp't Ex. 24.]

On review, the Supreme Court of Florida stated:

> We find that evidence in the form of Dr. Mhatre's reports and testimony, the DOC reports, and the testimony by DOC personnel support the circuit court's conclusion that Alston is competent to proceed. Dr. Mhatre diagnosed Alston as suffering from antisocial personality disorder and mild depression, but rejected the conclusion that Alston also suffered from bipolar disorder. He concluded that

17

Alston's symptoms of delusion were "clear malingering" and found none of the additional symptoms of bipolar disorder. Emphasizing Alston's "very high level of functioning," Dr. Mhatre concluded that Alston is capable of assisting in his own defense, exhibiting appropriate courtroom behavior, and challenging State witnesses. The DOC reports indicated that UCI staff psychologists Dr. Calderon and Dr. McKinsey evaluated Alston on two different occasions, found no evidence of psychotic psycho-pathology, and diagnosed him with an adjustment disorder with mixed feature and antisocial personality disorder. The DOC reports further indicated that although Alston exhibited a rambling speech pattern on a number of occasions, he also exhibited rational thinking and conversation. Wiley testified that Alston's delusional speech could be redirected to rational conversation and that Alston appeared capable of turning his symptoms "on and off." Finally, Sergeant Young testified that Alston appeared to purposely violate rules to ensure that he remained in disciplinary confinement, that Alston took on a "different demeanor" for mental assessments and legal calls, and that Alston was "rational, coherent, [and] calm" in his cell but exhibited delusional behavior when he was out of his cell and had "a forum or audience."

Although Dr. Myers concluded that Alston was incompetent to proceed, he also acknowledged that Alston's legal filings indicated a "coherent and organized thought process," that Alston appreciated the nature of the legal process, and that Alston exhibited some elements of malingering. Dr. Myers' diagnosis was that Alston suffered from "mild" grandiose and paranoid delusional thinking and that his symptoms were consistent with a "hypomanic episode," which was less severe than a manic episode. Only Dr. Berland found no evidence of malingering. However, he also found that Alston exhibited a factual, if not rational, appreciation of the nature of the proceedings.

Given the evidence at hand and the applicable standard of review, we conclude that a sufficient basis exists to support the circuit court's resolution of the conflicting evidence and that the circuit court did not abuse its discretion in finding Alston competent to proceed.

18

*Alston v. State*, 894 So. 2d at 55–56.

The appellate court reviewed the transcript of the *Durocher* hearing and noted that the circuit court conducted an inquiry compatible with *Faretta*, satisfying the court that Alston was literate and was not under any medication at the time of the hearing. The court found that "the transcript reflects that Alston repeatedly exhibited an understanding of the consequences of waiving his rights to postconviction counsel and proceedings." *Id.* at 58. The appellate court then concluded that "the circuit court, having held a hearing at which the judge explored Alston's age, education, and capacity to understand the consequences of waiver, has complied with the standards applicable to waiver of one's rights to collateral counsel and proceedings, and therefore did not abuse its discretion." *Id.*

We give these state court findings a presumption of correctness on review. There is evidence in the record that supports the state court's determination regarding Alston's waiver, and Alston cannot show that these findings are clearly erroneous. During the *Durocher* hearing, Alston indicated that he wanted to waive his post-conviction counsel and waive his collateral proceedings. He further indicated that he understood that as a result of his waiver, the Supreme Court of Florida would review the waiver, and if it determined that the waiver was valid, then the State would present his case to the Governor for the issuance of a

19

death warrant. *Id.* at 56. During the hearing, Alston also indicated that he understood that waiver of his right to collateral relief would bar the filing of future *pro se* petitions. Alston insisted that he did not wish to proceed with his post-conviction proceedings. *Id.*

Furthermore, the Supreme Court of Florida rejected counsel's argument that Alston's verbal rambling at the *Durocher* hearing called into question his competency to waive his rights. *Id.* at 58. The appellate court also rejected the argument that Alston's additional *pro se* filings following the hearing contradict the court's conclusion that Alston's decision was knowing, intelligent, and voluntary. *Id.* The record evidence supports the court's finding because there are numerous instances during the hearing where Alston specifically stated that he understood the consequences of his waiver—that it would result in the issuance of an imminent death warrant. Accordingly, because Alston cannot overcome the presumption of correctness that we afford the state courts' competency findings, we affirm the district court's order denying him federal habeas relief.[1]

## V. CONCLUSION

---

[1] At oral argument, we clarified with Alston's counsel that he was not challenging Alston's competency at the present time. Alston's counsel and state counsel both indicated that a proper competency challenge would be made at the appropriate time; i.e., when the State schedules Alston's execution.

Alston's claim regarding his competency to waive his post-conviction counsel and his collateral proceedings is not a challenge to the legality of his detention. Therefore, it is not a cognizable claim for federal habeas review. However, assuming that the claim is properly cognizable in federal habeas, Alston cannot demonstrate that the district court erred in finding reasonable the state courts' determinations that he was competent to waive his collateral counsel and proceedings and that his waiver was knowing, intelligent, and voluntary. Accordingly, we affirm the district court's judgment denying Alston federal habeas relief.

**AFFIRMED**.